## LOWREY v. HAWAII.

APPEAL FROM THE SUPREME COURT OF THE TERRITORY OF HAWAII.

No. 195. Argued March 20, 1907.—Decided May 13, 1907.

A foreign mission board maintaining a school in Hawaii in 1849 turned the school over to the government under an agreement, expressed in correspondence that the government should maintain it as an institution for the cultivation of sound literature and solid science, that no religious tenet or doctrine contrary to those inculcated by the mission, a summary of which was transmitted in the correspondence, should be taught, and that in case the government did not so maintain it, it should pay to the mission $15,000. After maintaining the school for many years as it had been maintained under the mission, the government converted it into an agricultural college and religion ceased to be a part of the curriculum. Meanwhile the constitution of Hawaii of 1894 prohibited the appropriation of any money for sectarian institutions. *Held*, in an action brought by the Mission to recover the $15,000, that,

Extrinsic evidence, as to what the parties did and the nature of the course of instruction when the agreement was made, and thereafter as continued by the government, was admissible to prove the intent of the parties as to what was meant by sound literature and solid science, and that under all the circumstances the agreement was that religious instruction was to be continued and on the failure of the government to continue such instruction the Mission was entitled to recover the $15,000.

The government of Hawaii was not relieved from its contract obligation by reason of the adoption of the constitutional prohibition against appropriation for sectarian institutions.

THIS action was brought in the Supreme Court of the Territory of Hawaii to recover from the Territory the sum of $15,000 as the alternative of the reconveyance of certain property conveyed by the American Board of Commissioners of Foreign Missions in 1849 to the Hawaiian government, for the nonfulfillment of the conditions upon which the property was con-

veyed. A demurrer was sustained to the petition and there-upon this appeal was taken.

. The following is an outline of the principal facts alleged:

The American Board of Commissioners for Foreign Missions, hereinafter called the American Board, for many years' prior to 1850 had conducted and maintained a Protestant Mission in the Hawaiian Islands, and as an essential part of its missionary work carried on many schools. Its most notable educational work was centered in a school established in 1831 at Lahaina-luna, on the Island of Maui, where it possessed a large tract of land. This school and the premises occupied by it were set off by the chiefs to the Protestant Mission in 1835. On the buildings and other improvements many thousands of dollars were expended, and the school had, in 1850, become a most important factor in the life and progress of the Hawaiian people, and was recognized as the leading educational institution in the kingdom.

The course of instruction comprised not only the usual topics belonging to secular learning, but included also direct religious teaching and training in the doctrines represented by the Mission.[1]

---

[1] Laws of the High School, as Amended and Adopted by the Mission June, 1835.

Chapter I.

Design of the School.

The design of the High School is,

1. To aid the Mission in accomplishing the great work for which they were sent hither; that is, to introduce and perpetuate the religion of our Lord and Saviour Jesus Christ, with all its accompanying blessings, civil, literary and religious.

4. Another object still more definite and of equal or greater importance, is, to educate young men of piety and promising talents, with a view to their becoming assistant teachers of religion, or fellow laborers with us in dissemi-nating the gospel of Jesus Christ to their dying fellow men.

Chapter VII.

Of the Studies of the School.

4. The whole school shall meet between daylight and sunrise each week

These facts were established before the board of commissioners to quiet land titles to which the claim of the American Board to Lahainaluna, as an established part of its system, was duly presented and recognized, and the board of commissioners adjudged as follows: "Lahainaluna, part 5, section 2, claim relinquished before the land commission in consequence of an after-arrangement having been entered into with the Hawaiian government by the Mission. Vol. 3 L. C. Award, p. 143 *et seq.*, upon the final confirmation which was duly made to the said A. B. C. F. M. all the lands claimed were awarded, 'with the exception of section 2, Lahainaluna, which had been withdrawn.' "

The "after-arrangement" referred to in the records of the land commission was as follows:

"Because of financial stress, and also feeling that the school, which had really become a national institution, should be conducted by the government at its own expense, in April, 1849, the Mission, at its general mission held at Honolulu, voted as follows: 'To make over this seminary to the government, it being understood that it is to be conducted on the same principles as heretofore.'

"An offer was thereupon made to the government in pursuance to this vote of the Mission to make over the school to the government on condition that it should be continued at its expense as an institution for the cultivation of sound literature and solid science, and, further, that it shall not teach or allow to be taught any religious tenet or doctrine contrary to those heretofore inculcated by the Mission, a summary of which will be found in the confession of faith herewith enclosed,

---

day for prayer, at which one of the instructors shall preside; the roll shall be called, absentees marked and called to an account at least once a week.

6. On the afternoons of Tuesdays and Thursdays each week, or at other times equivalent, the whole school shall meet for biblical instruction, embracing the interpretation of Scripture, evidence of Christianity, archeology and sacred geography. And Friday afternoon of each week or time equivalent shall be spent in exhibiting and correcting compositions in the Hawaiian language and in elocution.

and that in case of the non-fulfillment or violation of the conditions upon which this transfer is made by the said government, the whole property hereby transferred, · hereinbefore specified, together with any additions of improvements, should revert to the said Mission."

This offer as made was not accepted by the government, but it instead submitted a counter offer to the Mission, by which it offered to take over the school on the conditions made in the Mission's original offer, but "provided that in case of the non-fulfillment on the part of this government of the conditions specified in the letter of the above-named gentlemen, it shall be optional with this government to allow the institution, with all additions and improvements which may have been made upon the premises and all rights and privileges · connected therewith, to revert to the said Mission, to be held in behalf of the American Board of Commissioners for Foreign Missions, or to pay the sum of. $15,000; provided also that in case this government shall find it expedient to divert this establishment to other purposes than those of education it shall be at liberty to do so, on condition that it sustain an institution of. like character and on similar principles in some other place on the island or pay the sum of $15,000 to said Mission in behalf of the Mission Board in Boston."

A more definite form of the "confession of faith" was substituted and accepted by the government, and the whole arrangement ratified by the Hawaiian legislature, Law of 1850 (F. C. 1850), 158, sec. 1 of Civil Code (1859), sec. 783, and by the prudential committee of the American Board.

The letter of the Mission to the Minister of Public Instruction is inserted. in the margin.[1]

---

[1] Exhibit A.

HONOLULU, April 25, 1849.

To His Ex. R. Armstrong, Minister of Public Instruction of the Hawaiian Islands.

· Sir: The undersigned, a committee of the general meeting of the Mission of the A. B. C. F. M., at the Sandwich Islands, appointed in reference to the Mission Seminary at Lahainaluna, Maui, beg leave through your Excellency

The Hawaiian government at once took possession of the Lahainaluna Seminary and carried on the school exactly as it had been conducted by the Mission, both in religious instruction and the inculcation of sound literature and solid science.

For many years after the government had taken over the school the principals of the school continued their relations as missionaries of the American Board in their work in the school, and continued to make reports of their educational and religious

to offer a few remarks respecting that institution, and make some proposals in reference to it to His Majesty's Government for its consideration.

It is well known to His Majesty and also to most of the members of his government that in the year 1831 the mission commenced the establishment of the institution now known as the Mission Seminary at Lahainaluna, Maui, to promote the diffusion of enlightened literature and Christianity throughout the islands.

From that period to the present time this institution has been unceasingly and anxiously watched over, cherished and cared for by the Mission. No expense or pains coming within its appropriate means or power have been spared to promote its usefulness and secure the objects of its establishment.

Three missionaries have for a large portion of the time been devoted to its interests, and two at all times since the two or three first years of its existence. About $77,000.00 have been expended for its benefit, including the support of the teachers and the dwellings erected for their accommodation.

We need not point you to the fruits of this cherished institution, scattered throughout the islands, filling various posts of honor, responsibility and usefulness, both in and out of the government. They are well known to His Majesty, and the officers of his government, and to none better than yourself.

The institution has been planted and sustained to the present time by the American Board of Commissioners of Foreign Missions, from donations given by the American churches for the spread of the gospel in heathen lands. That board, as we learn by recent intelligence, was at the close of its last financial year embarrassed by a debt of $60,000.00, incurred in the prosecution of its labors of benevolence and mercy.

As a consequence of its indebtedness, it has been obliged to curtail its expenditures by diminishing its grants to each one of the missions under its care, and this Mission, in common with others, has shared in the general reduction.

For this reason the Mission will be unable to carry forward its operations with the vigor to be desired in all of its departments of labor. Some must almost inevitably suffer for want of pecuniary means.

In view of these facts, and believing that under present circumstances the transfer of this institution to the fostering care and patronage of Government will promote the highest interests of the Hawaiian people, we beg leave

work and instruction in the school to the general meetings of the Mission.

In 1862 the seminary buildings were burned down. Other buildings were built. The principal, in his report for that year, 1862–1863, reviewing the history of the school, says: "The Hawaiian government has always been a liberal friend and benefactor. . . . Never in any way have they interfered with our manner of instruction, or in the course of instructions

---

through your Excellency to submit to His Majesty's government for its consideration the following proposals, viz:

That the Mission of the A. B. C. F. M. at the Sandwich Islands, acting for and in behalf of the said American Board of Commissioners of Foreign Missions, having its headquarters in Boston, State of Massachusetts, in the United States of America, relinquish all of their right, title and interest to and in the seminary buildings located at Lahainaluna on the island of Maui, and known as the Mission Seminary, together with all of the dwelling houses at that station erected by the Mission at the expense of the said A. B. C. F. M., for the use of the teachers in the said Mission Seminary; also the building erected by the mission as a printing office and bindery; also all lands pertaining to and granted for the use of the Missionary Seminary, and also all philosophical and other apparatus procured for the use of the said seminary, also the public library of the said institution, and to transfer the same to the Hawaiian Government for its use, benefit and behoof to have and to hold the same forever.

Providing, however, and this transfer is made upon the express condition that the said Hawaiian Government agrees that the said institution shall be continued at its expense, as an institution for the cultivation of sound literature and solid science; and, further, that it shall not teach or allow to be taught any religious tenet or doctrine contrary to those heretofore inculcated by the Mission, which we represent, a summary of which will be found in the confession, of faith herewith enclosed, and in that in case of the nonfulfillment or violation of the conditions upon which this transfer is made by the said government, the whole property hereby transferred, hereinbefore specified, together with any additions or improvements which may have been made upon the premises, and all the right and privileges hereby conveyed or transferred to the Hawaiian Government by the said Island Mission shall revert to the said Mission, to have and to hold the same for and in behalf of the American Board of Commissioners of Foreign Missions.

These proposals, if accepted, by the Hawaiian Government, shall not have binding force until they shall have received the sanction of the Prudential Committee of the American Board Commissioners of Foreign Missions in Boston, and further, should the said Hawaiian Government accept the proposals here presented, and enter forthwith upon the fulfillment of the condi-

pursued. In our work we have had all the freedom which we possibly could have had under the A. B. C. F. M." Also, referring to pupils who, under the religious instruction at the school, became ministers, he says: "While six who were connected with it since it has been under the care of the Hawaiian government have been ordained to the same office."

Prior to the establishment of the Anglican Church in Hawaii the board of education appointed as instructors such persons as were acceptable to the Mission, generally selecting those nominated by the Mission. When the Anglican Mission was established it was proposed that the forms and probably the substance of religious instruction should be changed, and advice was asked of the Attorney General. His reply reviewed the whole arrangement upon which the government received the seminary, and concluded as follows: "Should the government not be willing to keep the conditions as far as I have shown, then the property and improvements must be restored to the A. B. C. F. M."

---

tions, and should the said transfer not meet the approbation of the Prudential Committee, the Mission, on its part, pledges itself to refund to the said Government any necessary expenses it may have incurred in carrying on the institution whilst the parties were awaiting the ratification or rejection of this transfer by the said Prudential Committee. Provided, however, that moneys shall not have been expended in enlargement or improvements, other than what may have been actually necessary to keep the buildings in repair and carry on the institution.

In case of disagreement of the parties as to the amount proper to be refunded, in case of the non-ratification of this conveyance by the Prudential Committee, the sum shall be determined by two arbitrators, one of which shall be chosen by each of the respective parties, and which arbitrators in case of disagreement shall elect a third to decide upon the award.

The foregoing remarks and proposals are respectfully submitted for the consideration of His Majesty's Government, and I     feel greatly obliged by an early answer.

We have the honor to be,

Very respectfully, your ex. friends and most obedient servants,

W. P. ALEXANDER,
C. B. ANDREWS,
S. N. CASTLE, *Com.*,
By S. N. CASTLE.

In 1865 the Hawaiian Gazette, the official mouthpiece of the government, declared that the government had resolved that its support should be given to schools irrespective of their religious teaching, but pointed out that the board of education might be chargeable with partiality for supporting a state church, inasmuch as it paid large sums to defray the expenses of Lahainaluna, where the principles and theology of one particular sect were exclusively taught, although opposed to the belief of all in communion with Roman Catholic and Episcopal churches.

In the following years, upon the suggestion by the Mission of certain instructors, a correspondence arose between the board of education and the Mission, in which the board of education said that it was understood that the institution was to be continued so as to aid instead of to defeat the purpose for which it had been founded, and that nothing had been done to justify the intimation that the board had any desire to defeat such purpose, and admitted "that a full compliance with agreement consists in appointing persons teaching in the doctrine and after the manner of the Congregational and Presbyterian Churches of the United States." And further: "The board are fully aware that if they do not see fit to carry on the institution according to the terms of the contract, they have to reconvey it, or pay the sum of $15,000."

After 1865 the seminary continued to be conducted on the same lines as prior thereto.

In 1894, in the constitution of the Republic of Hawaii, it was provided that ". . . No public money shall be appropriated . . . for the support of (or?) benefit of any sectarian, denominational or private school." This provision is continued and remains in full force as a part of section 55 of the organic act.

Religious instruction ceased to be a part of the curriculum at Lahainaluna, as provided in the agreement, on or about September 1, 1903, at which date the religious tenets and doctrines, in accordance with the creed and articles of faith

of the Mission, ceased to be taught, and are no longer taught. The "cultivation of sound literature and solid science" has also ceased, and the institution has become a technical school under the name of "The Lahainaluna Agricultural School."

The Territory maintains no other institution of like character and on similar principles in any other place on the island. The appellants are the successors of the American Board of Commissioners for Foreign Missions.

Upon these facts, it is alleged, that appellants have become entitled to a return of the property conveyed or to the payment of $15,000; that the Territory has refused to do either, but has elected to retain the property, which election is evidenced by its refusal to pay the said sum, and the further fact that it is proceeding to erect expensive buildings thereon and expend large sums of money to fitting the property and the school to become a technical school, namely, an agricultural college.

The petition was demurred to upon grounds substantially as follows:

1. That the court had no jurisdiction of the subject matter of the claim. 2. That the United States was a necessary party, the property described in the petition having been transferred and ceded to the United States by the treaty of annexation of July 7, 1898. 3. That the petition did not set out facts sufficient to constitute a cause of action in that, (a) it did not appear that the agreement set forth in the petition was ratified by the legislature; (b) that the right of action accrued more than two years prior to the commencement of the action; (c) it did not appear that there had been a breach of the conditions of the agreement; (d) or if so, that it occurred in compliance with law and statutes which rendered the fulfillment of the conditions impossible. 4. That the petition was indefinite and uncertain, in that the allegations as to breach of conditions pleaded were conclusions of law, it nowhere appearing in the petition in what respect the conditions had been broken. The Supreme Court overruled the first, second

and fourth grounds, and divisions *a* and *b* of the third ground of demurrer.

*Mr. David L. Withington,* with whom *Mr. William R. Castle,* *Mr. W. O. Smith, Mr. A. Lewis, Jr.,* and *Mr. C. H. Olsen* were on the brief, for appellants:

The central purpose of the agreement was to "continue" an established institution, the keystone of a system with defined and well-known aims,- the chief being the promotion of religion by instruction in definite religious truth.

The agreement was not one which the parties looked upon as setting forth *in haec verba* the final form of the agreement. The resolutions of the Mission were directed to be transmitted to the government.

Both parties contemplated that the language used was not a definite and final expression such as is contained in that class of documents from which the rule of interpretation of written documents arose, namely, engrossed writings, and all the more this Court should look for the spirit of the agreement, the situation of the parties, their motives, their conduct, their after-construction of the agreement, and putting itself in their place construe it as the parties construed it.

Parol evidence is necessary in order to apply the contract, for it was undoubtedly a part of the contract that an existing institution should be continued, and it is a matter of fact to be determined by parol evidence what that existing institution was.

This evidence shows that the promotion of religion by the inculcation of a definite system of doctrine was the central purpose of the Mission and of the seminary.

In resorting to parol evidence to determine the character of the institution to be continued, it is necessary to examine into its source, the purpose of its establishment, its aims, its methods, which inquiries reveal that the Mission from which it sprung believed in a system of theology, and believed absolutely and conscientiously that that system could be applied to the gov-

ernment of a, state and was the only perfect rule of guidance, particularly for a savage nation in its rudimentary development to civilization and Christianity. Therefore, they purposed to found in Hawaii a theocracy in which the Scriptures as interpreted by their creed should be the fundamental law, to inculcate which they established a system of schools in which the study of the Scripture and of religious truth was the primary purpose, of which system the Lahainaluna Seminary, from which preachers and teachers of that truth should go forth, was the keystone.

This is consistent with the conduct of the parties at the time, their declarations in the correspondence and the construction which has been put upon the agreement in after years. Can it be, when the Mission has been lulled into security by the assurance of the Hawaiian government as late as 1865 that there was no misunderstanding as to the construction of the contract, that after forty years longer adherence it can now be repudiated?

A term can be read into a contract from the surrounding circumstances. *Bradley* v. *Packet Co.*, 13 Pet. 89.

Extrinsic evidence is admissible, of all the circumstances surrounding the author of an instrument, to explain the sense in which he understood it. *Reed* v. *Merchants' Mut. Ins. Co.*, 95 U. S. 23.

Even if there is no provision in the contract, evidence of the circumstances may be offered to show that such was a part of the contract. *Field* v. *Munson*, 47 N. Y. 221; *Shouse* v. *Doan*, 39 Florida, 95; *Savings Bank* v. *Fraze*, 9 Ind. App. 161; *Staples* v. *Lumber Co.*, 56 Minnesota, 16; *O'Dea* v. *City of Winona*, 41 Minnesota, 424; *Jennings* v. *Whitehead Co.*, 138 Massachusetts, 594; *Erskine* v. *Adeane*, L. R. 8 Ch. 756; *Katz* v. *Bedford*, 77 California, 319; *Gas Co.* v. *Braddock Wire Co.*, 155 Pa. St. 22; *Cleburne Water Co.* v. *Cleburne*, 138 Tex. Civ. App. 141; *Nilson* v. *Morse*, 52 Wisconsin, 240. And see 6 Eng. Ruling Cas. 169.

The instruments construed as a whole make it a necessary

inference that the maintenance of religious instruction and training in the doctrines of the mission were a part of the contract, and this term will be read in. 2 Page on Contracts, 1740, § 1118.

Courts have even gone so far as to hold that where the contract speaks of one, the plural can be inferred. *Halt* v. *First National Bank*, 133 Illinois, 234. So a conveyance for use as a burial place for a member of the Roman Catholic church in consecrated ground would restrict the lot holder from interring therein any person not recognized by the church authorities as a Catholic, although no such clause was in the agreement. *Dwenger* v. *Geary*, 113 Indiana, 106.

*Mr. Lorrin Andrews, Mr. E. C. Peters* and *Mr. M. F. Prosser*, for appellee, submitted:

Such conditions as were attached to the transfer of Lahainaluna Seminary were conditions subsequent.

Conditions subsequent are not favored in law and are strictly construed as against the grantor and nothing will be taken by way of intendment in favor of the grantor. 4 Kent's Com. 138; *Woodworth* v. *Payne*, 74 N. Y. Rep. 196–199.

It does not appear by the record that any of the conditions of the transfer have been broken.

The condition that "it shall not teach or allow to be taught any religious tenet or doctrine contrary to those heretofore inculcated by the mission which we represent, a summary of which will be found in the Confession of Faith herewith enclosed" certainly is not shown to be broken by the pleadings; it would require an allegation that religious doctrines contrary to the adopted creed were taught. In no other way could a breach of the foregoing condition be shown.

This leaves the question whether the agreement to teach sound literature and solid science was broken by failure to teach those branches of learning otherwise than they would require to be taught in a technical school and school of agriculture.

.An agreement to teach solid science is not violated, but is observed, by teaching applied science relating to agriculture. The science of agriculture cannot be taught without imparting at the same time instruction in the literature relating to the science.  It is not apparent why such literature, so taught, is not as sound or as valuable as are literary studies undertaken by themselves, or that the agreement is broken by teaching solely that literature which is limited by the study of science.

When the performance of conditions subsequent is prevented by the act of God or becomes contrary to law by reason of the transfer of the territory or change of government, failure to fulfill such conditions will not work a forfeiture of the estate.  *United States* v. *Arredondo*, 6 Pet. 745; *Scoville* v. *McMahon*, 62 Connecticut, 378; *Wheeler* v. *Moody*, 9 Texas, 371–376.

MR. JUSTICE McKENNA, after making the foregoing statement, delivered the opinion of the court.

The contentions of the parties are sharply in opposition as to the agreement and the necessity and competency of extrinsic evidence to explain it.  Appellee contends that we are confined to the letter of the agreement, and so confined its conditions have been fulfilled.  In other words, that "sound literature and solid science" are still cultivated, and that no religious tenet or doctrine contrary to those heretofore inculcated by the Mission is taught.  Or, to express the contention in language other than that of the agreement, that a school devoted to one subject of secular science and which excludes all religious teaching was contemplated by or is permitted by the agreement.  Opposing these views, appellants contend that a mere technical school does not fulfill the agreement; that the terms of the agreement require the "inculcation of general learning and knowledge," accompanied with religious instruction in accordance with the confession of faith submitted to the Hawaiian government.  And, it is insisted, that if there is any-

thing doubtful in the agreement, it may be interpreted by the circumstances which preceded it and the immediate and long-continued practice under it. If we may resort to those circumstances and that practice there cannot be a shade of doubt as to the intention of the parties. It is insisted, however, by the appellee that the agreement is clear and unambiguous and that it does not present a case for the resort to extrinsic evidence. We cannot concur with this view. There is quite a range of meaning in the words "sound literature and solid science." To interpret or specialize them and make definite application of them would certainly receive aid from the practice of the parties. It is contended by appellant that there was a close connection between them and the "definite system of doctrine" which was the "central purpose of the Mission." We, however, need not dwell further upon this contention, though a plausible argument has been advanced to sustain it, and we pass to the next controverted contention. The words of the agreement are that the government "shall not teach or allow to be taught any religious tenet or doctrine contrary to those heretofore inculcated by the Mission, a summary of which will be found in the confession of faith herewith enclosed . . . " Were these words all there was of prohibition and purpose as to religion? May we believe that it became suddenly the purpose to change an institution which had had its impulse and foundation in religious zeal to convert the Hawaiians to Christianity and to educate young men to be "teachers of religion," to one simply literary and scientific and nonsectarian? Had the belief of the Mission in its form of Christian faith become so indifferent that it would transfer a seminary instituted for the propagation of that faith with no other condition than that contrary tenets should not be taught? There is not a syllable in this record to justify such assumptions. It must be remembered that we are considering a transaction which occurred in the Hawaiian Islands in 1849, and by the conditions of that time were the acts of the parties induced. Besides, the agreement is not in a formally executed

paper.   It is found in a correspondence, and is constituted and explained by the whole of the correspondence.   And taking the whole of it, there is very little aid from extrinsic evidence needed to demonstrate its meaning and purpose.

The Mission reminds the Minister of Public Instruction that the seminary was established in 1831, "to promote the diffusion of enlightened literature and Christianity throughout the islands," and that it had been unceasingly watched over, cherished and cared for by the Mission, and that $77,000 had been expended for its benefit.   It was stated that in consequence of debts incurred "in the prosecution of its labors of benevolence and mercy" the American Board of Commissioners of Foreign Missions was compelled to diminish its grants to each of the missions under its care, including the Hawaiian mission, and that the latter for that reason would be "unable to carry forward its operations with the vigor to be desired in all of its departments of labor." In view of these facts, it was stated and believed that under the circumstances the transfer of the institution "to the fostering care and patronage of the government" would "promote the highest interest of the Hawaiian people." An offer was then made to transfer the seminary with the conditions which we have referred to.   A confession of faith was enclosed. The government modified the proposal by reserving the right to pay $15,000, as an alternative to the reversion of the property to the Mission if the government should not fulfill the conditions of the grant.   The modification was accepted, and in a subsequent communication a new confession of faith was substituted to that originally proposed.   The following are the reasons which were given:

"The reasons for requesting the substitution are, that the previously presented confession, although according in all its specified doctrines with our belief and with that also of the churches by whom that institution has been founded and sustained, is yet not so distinctive, as to present a barrier to the introduction there, of other deleterious doctrine not speci-

fied in said confession. It will admit, also, of teachings of this Mission and of the churches sustaining it, such as we feel to be entirely subversive of evangelical Christianity. Not doubting, but that these reasons will commend themselves to the members of His Majesty's Government, we beg leave to express in presenting them the high consideration with which we remain."

The correspondence concerned the transfer of a school established in 1835, the design of which was to perpetuate the Christian religion, and with an object described to be "still more definite and of equal or greater importance," that is, " to educate young men to be Christian ministers." A religious instruction was prescribed. All this the government was informed of when the proposition was made to transfer the school to its "fostering care and patronage." And the government accepted the grant, accepted as it was tendered, and necessarily for the purpose it was tendered.

Even if we stopped here, conviction of the justness of that conclusion is almost indisputable. It becomes indisputable if extrinsic evidence be considered, and we have no doubt that it may be. In *Bradley* v. *W. A. & G. Packet Co.*, 13 Pet. 89, a contract expressed in a correspondence between the parties for the hire of a steamboat, an exception was engrafted which was not expressed, upon evidence that the owner of the boat knew the service for which it was intended, and that when navigation was obstructed by ice another mode of transportation was resorted to. The court said, as to extrinsic evidence, it was applied in some cases "to ascertain the identity of the subject; in others its extent. In some, to ascertain the meaning of a term, where it had acquired by use a broad meaning; in others, to ascertain in what sense it was used, where it admitted of several meanings. But in all the purpose was the same. To ascertain by this medium of proof the intention of the parties, where without the aid of such evidence that could not be done, so as to give a just interpretation to the contract." And it was expressed "as the just result" of the cases,

"that in giving effect to a written contract, by applying it to its proper subject matter, extrinsic evidence may be admitted to prove the circumstances under which it was made; whenever without the aid of such evidence, such application could not be made in the particular case." In *Brooklyn Life Insurance Co.* v. *Dutcher*, 95 U. S. 269, it was said: "There is no surer way to find out what parties meant than to see what they have done." So obvious and potent a principle hardly needs the repetition it has received. And equally obvious and potent is a resort to the circumstances and conditions which preceded a contract. Necessarily in such circumstances and conditions will be found the inducement to the contract and a test of its purpose. The conventions of parties may change such circumstances and conditions, or continue them, but it cannot be separated from them. And this makes the value of contemporaneous construction. It is valuable to explain a statute where disinterested judgment is alone invoked and exercised. It is of greater value to explain a contract where self-interest is quick to discern the extent of rights or obligations, and never yield more than the written or spoken word requires. See, for further illustration, the following: *Reid* v. *Merchants' Mutual Insurance Co.*, 95 U. S. 23; *District of Columbia* v. *Gallagher*, 124 U. S. 505; *Topliff* v. *Topliff*, 122 U. S. 121; *Paige* v. *Banks*, 13 Wall. 608; *Philadelphia R. R. Co.* v. *Trimble*. 10 Wall. 367; *Chicago* v. *Sheldon*, 9 Wall. 50; *Carazoo* v. *Travano*, 6 Wall. 733; *Simpson* v. *United States*, 198 U. S. 397, 399; *Chicago Great Western Railway Co.* v. *Northern Pacific Railway Co.*, 101 Fed. Rep. 792. And many state cases could be cited.

The design of studies for the school we have detailed. The government recognized and continued both without question or change in any way. The seminary buildings were burned down in 1862. The government rebuilt them and continued the school. The petition alleges that the principal of the school in 1862–1863 in his report said: "The Hawaiian government has always been a liberal friend and benefactor . . .

Never in any way have they interfered with our manner of instruction or in the course of instruction pursued. In our work we have had all the freedom which we possibly could have had under the A. B. C. F. M." Also, referring to pupils who, under the religious instruction at the school, became ministers, he says: "While six who were connected with it since it has been under the care of the Hawaiian government have been ordained to the same office."

In 1864 new interests appeared and a change in the purpose of the school commenced to be urged. It was met by an adverse opinion of the Attorney General, who pointed out the conditions of the transfer and the condition of their non-fulfillment to be the restoration of the property to the A. B. C. F. M. And, again, in 1865 the board of education, while denying the right of the Mission to nominate instructors, conceded the obligation to continue the institution, "so as to aid, instead of defeating, the purpose for which it was founded," and the alternative to be the surrender of the property or the payment of $15,000. "Religious instruction," it is alleged, "upon the lines formerly pursued by the Mission and subsequently by the government, in accordance with the agreement, was continued up to or about September 1, 1903." We hence see that not only the immediate practice of the government construed the agreement as contended for by appellants, but the practice of over fifty years proclaimed the same meaning —proclaimed it without question and against a suggestion and agitation to reject it. It is somewhat staggering to be told that such continuity of practice is not a legal interpreter of the meaning of the parties and that the only criterion can be a precise and isolated form of words which, at the end of half a century of contrary admission and declaration, one of the parties finds it convenient to bring forward.

It is no defense that the government's policy has changed. It cannot so release itself from its engagements. The provision for the teaching of "sound literature and solid science" might be considered of "expansive character," to use the

description of Lieber, and change with the progress of both. The provision for religious teaching is unchanging. It is as definite and absolute to-day as it was when it was written. The alternative of it the agreement has made the return of the property conveyed, or the payment of $15,000.

*Judgment reversed and case remanded, with directions to proceed in conformity with this opinion.*

MR. JUSTICE BREWER took no part in the decision of this case.