CRITTENDEN v. COBB et al.

(Circuit Court, M. D. Pennsylvania. September 2, 1907.)

No. 55, May Term, 1906.

1. EVIDENCE—PAROL EVIDENCE—CONTRACTS—CONSTRUCTION.
   Where a written contract uses a term which is not self-explanatory as applied to the subject-matter, parol evidence is admissible to show its meaning, including what was said when the contract was made.
   [Ed. Note.—For cases in point, see Cent. Dig. vol. 20, Evidence, § 2104.]

2. CONTRACTS—CONSTRUCTION—SALES—"UNDIVIDED" BONDS—PLEDGE.
   Plaintiff and defendants, being interested with others in the construction of a railroad, which was to be paid for in stock and bonds of the

company at so much a mile, the interest of each being measured by the amount of money respectively contributed therefor, after such stock and bonds had been received, and the interest of each therein had been definitely determined and agreed upon, and a part of the same distributed, entered into an agreement in writing by which the plaintiff sold and the defendants agreed to buy at 75 cents on the dollar all the bonds which the plaintiff owned, "divided or undivided." At the time this agreement was executed certain of the said bonds, which had been received on joint account of all the parties interested, had been put into the hands of one of the defendants, in trust to secure outstanding obligations incurred in the construction of the railroad, which obligations, prior to the bringing of the suit, but not until after the execution of the agreement in question, the said defendant had individually paid off. It being practically undisputed that by the expression "undivided bonds," used in the agreement, the bonds so held in trust were intended to be referred to, the plaintiff was entitled to recover from the defendants the price of his share of them, subject to a deduction and reimbursement of the defendants for a proportionate part of the joint indebtedness for which they stood pledged, without any prior settlement between the parties, or the payment by him of his part of such indebtedness, or the segregation in his favor of a definite number of said bonds; nor did it matter that upon a foreclosure sale of the railroad but 41 cents on the dollar was received for said bonds, which did not pay the amount for which they were pledged.

**3. SAME—PROHIBITED CONTRACT—DIRECTOR OF RAILROAD INTERESTED IN CONSTRUCTION—ACTION FOR PRICE OF BONDS GROWING OUT OF SUCH ILLEGAL CONTRACT—SALE OF BONDS NOT IN ESSE.**

The plaintiff, being also interested with the defendants in the construction of an extension of the said railroad, which was to be similarly paid for, was further entitled to recover the price of the bonds which were coming to him as his share of the profits arising therefrom, which could be determined by the jury in this action, without a previous settlement between the parties, by charging up the costs of construction against the amount to be received therefor; nor was this affected by the fact that the plaintiff, as a director of the road, was prohibited by law from being interested in its construction, the action being for the price of the bonds into which the transaction had ripened, and not for the profits arising out of it, even though the number of bonds which he was to receive was to be measured thereby; nor was it of any significance that at the time of entering into the agreement of sale the bonds in question had not yet been delivered, it being testified by the plaintiff and others that they were mentioned at the time as intended to be included under the head of "undivided bonds," and the parties having thus treated them as in posse, if not in esse.

**4. PARTNERSHIP—ACTION BY PARTNER TO RECOVER INTEREST IN ASSETS—FORM.**

Where a partnership has merely to do with a single completed transaction, an action at law may be maintained by one partner against another to recover his share of the profits of the transaction where an accounting is not necessary to ascertain the amount.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Partnership, § 170.]

**5. NEW TRIAL—GROUNDS—PLEADING—VARIANCE—FAILURE TO OBJECT.**

A variance not objected to during the trial cannot be taken advantage of on a motion for a new trial when of such a character that it did not mislead and could have been obviated by an amendment of the pleadings at the time.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 37, New Trial, § 38.]

At Law. On rule for new trial.

Thomas H. Murray, W. I. Lewis, and A. F. Jones, for the rule.
W. K. Sweatland and A. S. Heck, opposed.

ARCHBALD, District Judge. By the agreement in suit, the plaintiff in terms contracted to sell, and the defendants to buy, the stock and bonds which he owned of the New York & Pennsylvania Railroad. The stock is specifically designated in the writing, but the bonds are not, it being impossible to do so, as it is stated, for the reason that some of them are "undivided," it being the declared intention, however, that the plaintiff should sell and the defendants should buy all that the plaintiff owned, whether divided or undivided, being restricted only to those which he then owned, the plaintiff not having the right to acquire and deliver others. As to what was meant by undivided bonds, the agreement not being self-explanatory, parol evidence was properly admitted to identify the subject-matter, including what was said at the time the agreement was executed. Lowry v. Hawaii, 206 U. S. 206, 27 Sup. Ct. 622, 51 L. Ed. 1026. This is not making a new contract for the parties, as charged, but simply interpreting and rendering intelligible the one that they have made. A division of stock and bonds, upon a settlement between the parties to the agreement and others, is there spoken of, based on the amount of money advanced in the common enterprise out of which the bonds in suit in large measure grew; the undivided portion of the stock and of the bonds being declared to be the same. But this is as far as it goes. And it leaves the contract as so entered into to be made certain by extraneous evidence by which alone the intent of the parties, and that to which it is to apply, can be ascertained. The rule operates in favor of one side as much as the other, being open to the defendants, as buyers, if the plaintiff were the recalcitrant party, in order to enforce the sale, and being equally available in consequence in his behalf as seller, at this time.

If this be the correct view, it is conceded that the verdict of the jury has settled a part at least of the controversy. It was testified, for instance, that of the $16,000 of bonds which were found due and turned over to the plaintiff, as the result of the settlement of September 8, 1898, referred to in the agreement, $5,000 was given by him to William Cobb to take to his brother Theodore as additional security for certain lumber contracts upon which the plaintiff was obligated, and for which Theodore already had $6,000 of bonds, but did not think them enough. The receipt of the $6,000 is not disputed, and, the labor contracts having been taken care of by the plaintiff, these bonds were settled for by the defendants shortly before the trial. But that $5,000 additional bonds were ever given to William for his brother is denied, and was one of the questions submitted to the jury. They believed the plaintiff and his witnesses, however, and found in his favor with regard to them, and, these bonds unquestionably coming within the designation of divided bonds, that is the end of the matter.

But growing out of the same transaction by which the plaintiff got $16,000 of bonds, of which the $5,000 was a part, there were $60,000 others, which by the agreement of all concerned were put into the hands of Theodore Cobb in trust to secure the payment of some $30,000 of indebtedness which had been incurred on joint account in the building of the railroad, for which stock and bonds, at the rate of $10,000 of each per mile, had been taken in payment. That the plaintiff had an interest

in these bonds, proportioned to the amount which he put into the venture as fixed by the settlement of September 8, 1898, subject only to the payment of the indebtedness for which they were pledged, there can be no question. It is also practically undisputed that, under the head of undivided bonds, whatever was coming to the plaintiff out of this particular lot was intended to be included and be made the subject of purchase by the defendants. Mr. Orcutt, a prominent attorney of Hornellsville, N. Y., now general counsel for the Erie Railroad, who drew the contract, and was a witness for the defendants at the trial, so testified, as did every one else who was present at the time, except the defendants, even William Cobb admitting it qualifiedly, in the face of which the general denial which is made on their behalf is of little consequence. The fact is that except the Millport Extension bonds, to be presently referred to, there was nothing besides to which the term "undivided bonds" could apply, and the jury, upon this branch of the case, could not well do otherwise than to find, as they did, in the plaintiff's favor.

It is said, however, that the bonds were pledged to secure the $30,000 of indebtedness mentioned, all of them for every part of it, and that the plaintiff had no separable or distinct interest to dispose of, until the whole of it had been taken care of. This, to a certain extent, no doubt, is true; and if the joint obligations, to secure which the bonds were pledged, were still outstanding, the right of the plaintiff to recover for them might be involved in some difficulty, the ultimate amount realized for them upon a foreclosure sale of the road having been but 41 cents on the dollar. But whatever might be said, if the situation remained that way, the fact is that in January, 1900, some four or five months after the agreement in suit was made, and long before action brought, Theodore Cobb, into whose hands the bonds had been intrusted, paid off the notes at bank, for which they stood, after which the indebtedness was due to him alone, each party involved, the plaintiff and the defendants with the rest, being severally responsible for his part of it. And the bonds being at the same time held by Mr. Cobb for the purpose of reimbursement, when he and his brother William agreed to buy the plaintiff's undivided share of them, at the rate of 75 cents on the dollar, owing the plaintiff on this account, as he and his brother so did, by virtue of the purchase, and the plaintiff on the other hand owing him a proportionate part of the joint indebtedness, the one offset the other, the defendants having in their own hands the means of payment, releasing the rest of his share and making the defendants liable to him therefor. And this answers the objection that a settlement had first to be made between the parties, the bonds having to be segregated in that way, according to the argument, before there was anything for the plaintiff to sell, or to recover for here. Nothing of the kind is to be deduced from the agreement; the parties apparently not being impressed with the necessity for it. But, without regard to that, there can be no question that, subject to the reimbursement of Theodore Cobb for a proportionate part of the $30,000 indebtedness, the plaintiff was entitled to a definite number of bonds, about $8,800 of them, according to the ratio established by the settlement of

September 8, 1898, and this, such as it was, the defendants could buy and the plaintiff sell, as they respectively did, leaving the mutual indebtedness so resulting to adjust itself in the way suggested, and rendering the balance recoverable here.

The remaining controversy was over the bonds received for the building of the Millport Extension, some $54,800. The contract with the company for building this road was taken by Theodore Cobb, as the other had been by J. B. Rumsey, but the plaintiff claimed an interest by virtue of an arrangement, proposed, as he testified, by the defendants, by which he, they, Rumsey, McConnell, and Richardson, were to participate, each to put up $5,000 to cover the cost which was estimated at $30,000. McConnell and Richardson admittedly never went in; and Rumsey dropped out soon after the work started. But the others went on, according to the plaintiff, he superintending the construction and doing practically all that was done by any one in that direction, the defendants furnishing the money, including his share, which he had arranged to raise, but was excused by them from doing. All this, of course, was denied, but the jury have accepted it, and it is therefore to be taken as true. The road was something over five miles long, and cost from $26,500 to $29,000, the railroad company at the contract rate paying $58,400 for it, both in stock and bonds. These bonds, as testified by the plaintiff and his witnesses, were also mentioned at the time of the agreement, and were intended to be covered by it. The jury so believed, and have allowed for them, but without interest. Strongly supporting this finding, it is to be observed that not only, like the $60,000, do they come within the description of undivided bonds, but that, if the latter were the only ones of the kind intended, there would be no such difficulty in specifying them, as is spoken of in the agreement, as Mr. Orcutt who drew it himself admits. There might have been, as to the divided ones, which were considerably scattered, but that is not the way it is put; the difficulty being distinctly attributed to the undivided ones, and there it must rest.

It is objected that Crittenden was a director in the road, as were the others, the defendants with the rest, and was therefore prohibited by both Constitution and statute from having any interest in its construction. Const. Pa. art. 17, § 6, Act May 15, 1874 (P. L. 178). But we have passed the point where that would be material. Suit is not brought on the asserted arrangement between the parties with regard to building the road to recover a share of the profits, nor yet for the bonds representing this, but for the price of the bonds, which simply accrued to the plaintiff out of it, which the defendants agreed to buy. It is the same as if, the transaction having been completed and the stock and bonds coming to the plaintiff having been turned over to him, the defendants had offered him a certain sum for them, which he had agreed to take. It would be no answer in that case, to an action by the plaintiff on the sale, that the bonds came from a tainted source, or that he became entitled to them in an unlawful way. Nor is this changed by the fact that at the time of the bargain, as well as of suit brought, the bonds were in the defendants' hands. It is true that, in consequence of this, the prohibited arrangement has to be resorted to, to establish and determine the plaintiff's interest, and that except for

it he would have none. But, as already stated, the thing trafficked in and now sought to be enforced is not the gains coming to him out of it, but the bonds into which it had ripened, or rather the price of them, which the defendants agreed to pay. Suppose, to put it another way, the defendants had said, "You have so many bonds due you from the building of the Millport Extension, for which we will give you so much"; and the plaintiff had accepted the offer—can there be any question but that the defendants would be bound? And yet, except, perhaps, in definiteness of expression, there is nothing different from that here.

It is said, however, that Crittenden was a partner with the Cobbs, if anything, and that the bonds to which he was entitled could only be determined in consequence by a settlement of the partnership affairs which it is not competent to make here. But, assuming that technically there was that relation, it has long been held that, where a partnership has merely to do with a single, completed, transaction, assumpsit by one partner against the other may be maintained. Brubaker v. Robinson, 3 Pen. & W. (Pa.) 295; Galbreath v. Moore, 2 Watts (Pa.) 86; Hamilton v. Hamilton's Ex'rs, 18 Pa. 20, 55 Am. Dec. 585; Kutz v. Dreibelbis, 126 Pa. 335, 17 Atl. 609; Welch v. Miller, 210 Pa. 204, 59 Atl. 1065. The railroad in the present instance was long since built, and the stock and bonds which paid for it were received by the defendants and appropriated to their own use. Over against them, they were entitled, of course, to charge up the cost of the road, and, while this is variously estimated at from $26,500 to $29,000, made up of various items, they are all on one side, with nothing to do but to add them up and strike a balance. This represents the profits of the transaction, for a proportionate share of which the defendants were accountable to the plaintiff, determining the number of bonds to which he was thereupon entitled, which by the agreement in suit they in turn undertook to buy. And this could just as well be settled by a jury, as to send the plaintiff elsewhere to a bill. It is to be observed, moreover, as already pointed out, that the plaintiff is not suing for his share in the partnership business, if such it was, but for the price of the bonds coming to him out of it, which he had necessarily to pursue by action; and that, if the defendants agreed to buy these bonds as testified, they are liable for them here whatever may be the complication in getting at the amount. It would be absurd to hold that, in order to arrive at what was due to the plaintiff on the purchase, he would be compelled to the circuity of first bringing a bill in equity to settle the partnership affairs, after which alone an action would lie.

But it is further said that the bonds for the Millport Extension had not been issued on August 30, 1899, the date of the agreement, having been held up by the executive committee, who refused their approval until certain unfinished matters of construction had been fixed up. But $40,000 of them, at least, were authorized by resolution of the company in January previous; and, while there was no issue or delivery of them at that time, the basis was laid for it to that extent. The unfinished matters, moreover, were remedied the same summer, and the approval of the committee was given September 1, 1899, two days

after the agreement, which removed the bar. That they were not actually issued, and that Theodore Cobb did not get them, until two months afterward, is not material. The parties could well treat them, under the circumstances, as in posse, if not in esse, and bargain with regard to them as they did, without its being open to question here. That the bonds were not in existence no doubt affords an argument against the intention of including them, but if, as the jury have found, the purpose was otherwise, it is idle to argue that there was anything in the way of the parties doing so.

It is finally said that the plaintiff in his statement has in terms declared for bonds, which prior to August 30, 1899, were "the individual property of the plaintiff," and which "were then and there in the possession and control of defendants," and that this, whatever the scope of the agreement, excludes all bonds of which it was not, in fact, true. This point was not made at the trial when it might have been met by amendment if material, and so might be passed over, or an amendment allowed to cure the matter now. But the averment to which reference is thus made is a mere matter of description, by which the defendants could not be and were not misled. Taking the whole statement together, the plaintiff unmistakably declares upon the agreement for all the bonds covered by it, which in so many words extends to all that he then owned. There may have been a certain inaccuracy in speaking of these particular bonds as in the possession of the defendants, but not, as in their control, which from the standpoint of the plaintiff they practically were. But, if there was a variance in the evidence, objection should have been distinctly taken to it at the time, which the obscure reference to the pleadings in one or two of the defendants' points cannot be held to do.

There being no occasion therefore for disturbing the verdict, for any of the reasons assigned, the rule for a new trial is discharged.