Camebell, Ohief Justice,
delivered the opinion of the court:
On or about December 13, 1917, the Austin Co. entered into a contract (No. 2713) with the defendant, represented by the Bureau of Yards and Docks, for the construction and completion of 22 powder dry houses, in accordance with certain specifications, the work to be done at the defendant’s naval proving ground, Indianhead, Md. The work was to be done under what is called a “ cost-plus ” contract. It involved an estimated expenditure of approximately $366,-000. The defendant had let contracts for other work at Indianhead to other contractors and found it necessary to annul some of these and relet the work to plaintiff under the oost-plus plan.. Still other work was provided for under plaintiff’s contract, the general character of which is indicated by what was called “ change orders ” D, E, F, G, I, K, and L, copies of which are attached to the petition, all *133 referring to additional work under the terms of contract No. 2713. Change orders A, B, and C refer to work begun by other contractors and relet to plaintiff, as above stated', and these different change orders contemplated 15 or more distinct structures — storehouses, powder dry houses, office buildings, solvent recovery buildings, gun bases, and others.
In addition to the contract and change orders mentioned, the plaintiff and defendant entered into seven or more other contracts for the construction of buildings and works at Indianhead upon the cost-plus plan, viz: No. 2602, for two blending towers; No. 2715, for extension of power house; No. 2747, for two magazine buildings; No. 2748, for five sets of double quarters; No. 2749, for pulping and poaching house; No. 2873, for cottages, garage, and quarters; and No. 2912, for construction camp. These contracts were made between December 24, 1917, and April 18, 1918. The expenditures involved under plaintiff’s first contract grew under the additional contracts and change orders from the amount above stated to about two and a quarter millions of dollars. A general provision of the contracts and change orders was that the contractor’s compensation would be a sum equal to 10 per cent of the cost of the work performed directly and involving no subcontracts for labor at the site, and 5 per cent where the work was done indirectly and by subcontractors for labor at the site.
After the work was completed or suspended, as parts of it were, differences arose between the plaintiff and the Navy Department involving the amounts plaintiff was entitled to receive as compensation and amounts claimed by the Navy Department as proper deductions from sums it conceded would otherwise be payable to plaintiff. These questions are hereinafter stated under the several items of claim.
The plaintiff was an experienced contractor, had an excellent organization, and had undertaken many and large contracts for construction. It was strong financially.
The Naval Proving Ground at Indianhead was an isolated place on the Potomac River, remote from railroad connections, and reached by water transportation from Washington, about 45 miles, and by wagon road from the same place, *134 about 20 miles. Neither the necessary labor nor materials for the work were to be had at Indianhead. Labor had to bo sought at other, and sometimes remote, places, and materials had to be purchased elsewhere and transported, principally through the navy yard at Washington. An added obstacle to transportation of materials, and at times to the prosecution of the work itself, was an abnormal and almost unprecedented spell of cold weather in the winter of 1917-18.
The large number of contracts calling for different “ jobs,” each of which is treated separately in the requests for findings, have extended the court’s findings of facts to an unusual length, but it is believed that the findings as they appear make it unnecessary to discuss at length the facts. We shall therefore state our conclusions upon the several items made the bases of contention by the parties.
Item 1 involves a claim by plaintiff for reimbursement of its expenses in securing labor, and in connection therewith the maintaining of an office in Washington for the purchase of materials and the expedition of their delivery. The amount involved, including the percentage to plaintiff, is not controverted. The Government admits that the maintenance and expense of the office to expedite labor, purchase material and expediting delivery thereof, was a necessity under these contracts. Without any such concession, however, we think the facts demonstrate the necessity. It denies, however, that the expense of the maintenance should be borne by the defendant, and argues that whatever authority ■ the plaintiff had to. operate said office or incur this expense was for a temporary expedient. The facts show (Finding II) that at the time of beginning the work the plaintiff was authorized to incur the expense stated, and that arrangements were accordingly made “ with the approval of the officer in charge” for the performance of the service. The labor agent had to report directly to the officer in charge, who directed in one or more instances his movements. The officer fixed the number of men to be used in this work, and from time to time their wages. It also appears that in March of 1918 there was paid to plaintiff, on approval of the officer in charge, a considerable sum for the expense to March 14 of the office and service in question. In view of these facts, *135 and the conduct of the parties, it can not be reasonably maintained that the defendant should not reimburse plaintiff for the expense incurred and pay the agreed percentage. The payment made for a portion of the time when the same kinds of expense were involved, and there was a full knowledge of the facts, furnishes a practical interpretation by the parties of the meaning of their contracts in this regard, which is entitled to much weight, especially when such payments were made before the matter became a subject of controversy. See Lowry v. Hawaii, 206 U. S. 206, 222. In view of the facts and circumstances of the case, we think that the defendant’s suggestion that the bureau only approved the expense in the event the labor was solely intended for In-dianhead, and therefore that plaintiff can not recover this item, is without merit. It can at least be said, however, that the suggestion is an admission that there was some authority from the bureau itself for the expense in question.
Item 2 (Finding III) is a claim for reimbursement and commissions on account of the construction and maintenance of the commissary. The stipulation of parties that, among other things, it was necessary, on behalf of the United States, to establish and conduct facilities for housing and feeding employees engaged in the work at Indianhead, sufficiently shows the importance of this item of charge, and we think should fix the defendant’s liability. In addition, however, it appears from the findings that the defendant’s agents had entire control of the conduct of the commissary and fixed its charges. Over the objection, or at least against the advice, of the plaintiff’s experienced agent the charges were for a period reduced and the reduction added to plaintiff’s loss. The expenses of this operation were a part of the cost of the work, and, according to the stipulation, were a necessary part of it. And if not, why was plaintiff paid for part of the expenditure ? The plaintiff was not conducting an independent boarding house. See Brogan v. National Surety Co., 246 U. S. 257. We think it is entitled to the balance unpaid and its commission on the whole.
Item 3 (Finding IV) refers to the cost of raising a sunken scow. It had brought sand or gravel to Indianhead from a vendor, from whom plaintiff purchased the material. *136 While moored at the wharf the scow sank, and defendant’s officer later directed that it be gotten out of the way because it was obstructing the proper use of the wharf. The plaintiff raised, or caused to be raised, the scow. Aside from the provisions of sections 21 and 27 of the “ General Provisions,” the facts show that, as between the plaintiff and the vendor of the material, the former was responsible for the care of the scow. It was designed of course to float, and was not expected to sink; and, when it did sink in the circumstances shown, there is an inference that somebody was careless. There was no fault imputable to the defendant; and, if the plaintiff’s vendor or owner of the scow was careless in the manner of mooring the vessel, the plaintiff should not have paid such vendor or owner to raise it. Without placing some responsibility on defendant for the sinking, there should not be a liability for the expense of raising it. The cii’cumstances attending what is suggested as an approval of the bill by the officer in charge sufficiently indicate a knowledge of plaintiff’s agent that it was not intended as an approval. This item we think should be disallowed.
Item 4 (Finding V) involves a deduction from plaintiff’s bills on account of discounts of which defendant’s agents claimed the plaintiff should have availed itself. The contract contained a provision requiring the contractor to take advantage of all the discounts available. It is, however, to be borne in mind that the contractor was not at liberty to buy whatever he saw fit to buy, but at all times there was supervision and the right of inspection and rejection by the officer in charge. The available discounts referred to were those which the vendors would agree to and accordingly bills were rendered, as is not infrequently the case, subject to a discount if paid within a stated number of days» The delay of the officer in charge in approving the bills should not impose on the plaintiff liability for discounts which it did not take advantage of because of such delay. It paid the entire bills in the cases referred to after the time allowed for the discounts had expired, and it should be reimbursed “ the actual net cost ” to it of the materials purchased, but not so approved as to make available the discount provision.
*137 Item 5 (Finding YI) involves a claim by the plaintiff that it is entitled to be paid a stated sum which it alleges was a damage or loss to it because of the delays of the defendant’s representatives in passing upon its bills and making payment thereof, and that this loss or damage is measured by an amount of interest it paid upon money borrowed by it in excess of what it would have borrowed if the payments had been forthcoming more expeditiously. Taking an average of what loans it had from time to time during a number of months and deducting from this average amount the sum of several items which it claims represent what its loans would have been if the vouchers had been promptly sent to it, the plaintiff contends that the interest on this difference for 16 months at the rate of 6 per cent per annum fairly measures a loss or cost to it for which it should be reimbursed. The basis of its contention in this regard is that the claim is part of the cost of the work.
It is quite plain that the method adopted for formulating the claim leads to considerable speculation. The average of all the loans does not show what interest was actually paid on any of them, and if it be true that the plaintiff in good faith provided what was regarded as a reasonable sum to carry on the contract, it is yet true that this amount was an estimate that would of necessity change with the amounts required by the additional contracts. An estimate of the funds needed to carry out a cost-plus contract involving a few hundred thousands of dollars would not be rer garded as a reliable estimate where the contracts involved millions. Section 29 of the “ General Provisions ” provides for vouchers by the officer in charge “ as soon as practicable after the end of each month, covering his estimate, according to the schedule of prices, of all material delivered, material worked into place, and work done to date,” and also provides for a 10 per cent reduction in some cases. The contractor was thereby informed that it should not expect payment at the end of the month, but as soon as practicable, “ after the end ” of the month, and its estimate of the funds it would need was to be made accordingly. And it was also informed that there could be a retention of 10 per cent of the difference between two stated estimates, which fact probably explains, in part at least, why there was an unpaid *138 balance due plaintiff for its expenditures from November, 1917, to January, 1919.
In making up wbat we are asked to accept as “ the maximum amount ” which plaintiff would have been required to borrow “ if the Government had made its payments promptly,” the plaintiff’s testimony tends to show that it took the amount of its “ normal loan ” and an additional sum because of prevalent conditions increasing the prices and another sum “ that should be furnished to this particular job,” these three items aggregating $350,000. This sum deducted from the average of loans outstanding during the months from December, 1917, to February, 1919, makes the difference above referred to, upon which interest is claimed as part of “ the cost of the work.” Upon what theory the interest on this difference is part of the “ cost of the work,” while concededly the interest on the larger sum laid out in the work is not a part of the cost of it, is not clear. The rule of practical construction by the parties, urged by plaintiff, and applied in other items of claim, is alike applicable to both parties. But if this item of claim was free from the speculation and uncertainty that inhere in the method and amount stated, we can not agree with the contention that interest on the loans, or excess in loans, to the contractor constitutes part of the cost of the work under the contracts in question. The meaning of the term “ cost of the work ” is not to be altered by the circumstance that one contractor has to borrow money to carry on the enterprise while a more fortunate contractor has sufficient funds without borrowing, or that one pays interest and another does not have to pay it. The Government undertook to pay for that portion performed directly by the plaintiff “ a sum equal to the cost of the work plus 10 per centum thereof,” and then with much particularity the contract sets forth a definition of cost of the work. The item of interest as part of this cost can not be deduced from anything in the definition. If it could be construed that it was a “ necessary expense connected with the work not specifically excluded in ‘ the addendum ’ to the contract, it would then have to be denied in the absence of an approval ‘ by the officer in charge as representing actual and essential elements in the cost of *139 tlie work.’ ” In any view, we think the claim is not allowable.
Item 6 (Finding VII). The claim for expenses of shipments by express instead of by freight is not allowed because the proof does not show that the expense was authorized.
Item 7 (Finding VIII). The payment for cement is shown by the stipulation to have been authorized, and the deduction of part of the sum paid upon the theory that the cement should have been purchased for less was erroneous. The plaintiff should recover the sum stated in the finding.
Item 8 (Findings IX-XXIV). This claim involves the question of liquidated damages, it appearing that the plaintiff was assessed with a large sum for delays in the completion of the houses and structures, of which there were many provided for in the different contracts and “ change orders.”
Certain of the contract provisions to be found in the “ General Provisions,” as sections 8, 11, 12, 13, and 14 are as follows: (8) That the contractor should commence work immediately after the delivery to it of a copy of the contract and continue without interruption unless otherwise directed by the Government.
(11) That in the event of the work not being completed within the stipulated time it should continue and be carried on according to all the provisions of the contract, and the contract should remain in full force, provided: “ That neither an extension of the time beyond the date fixed for the completion of said work nor the permitting or accepting of any part of the work after said date shall be deemed to be a waiver by the Government of its right to annul * * * or to impose and deduct damages as hereinafter provided.”
(12) Providing for extensions of times and requiring the contractor to submit in writing an application for extension, if at any time it considers that it be entitled to an extension of time, for any cause, for the completion of the work, “ stating therein the cause or causes of the alleged delay; ” and further providing that the failure or neglect of the contractor to submit its claim for an extension within 30 days *140 after the happening of the cause or causes upon which its claim is predicated “ shall be deemed and construed as a waiver of all claims and right to an extension * * * on account of the alleged delay,” and the contractor agrees to accept the finding and action of the Navy Department, Bureau of Yards and Docks, in the premises as conclusive and binding.
Section 13 provides for liquidated damages and the deduction thereof from the amount due the contractor in case the work is not completed within the time specified in the contract, or within such extension of the contract time as may be allowed.
Section 14 defines “unavoidable delays” and provides, among others, that “ delays caused by the acts of the Government will be regarded as unavoidable delays.”
It thus appears that the contracts between the parties provided not only for the payment by plaintiff of liquidated damages in the event of its noncompletion of the work in time, but also for extensions of time for any cause as well as prescribing a method of determining the question of extensions. Considering the purpose of a cost-plus contract, it is entirely appropriate, that it should have a clause providing for liquidated damage. The work was to be done rvithin the stipulated time, or “ within such extension of the contract time as may be allowed,” thus evidencing an intention that the liquidated damage clause should continue in effect in case of extensions. Section 11, above quoted, so provides.
Whether there should be extensions of time allowed were questions to be determined by the Navy Department, Bureau of Yards and Docks, and it has been repeatedly held that Avhere parties thus agree upon a tribunal to determine the question, effect will be given to their agreement. Gleason case, 175 U. S. 588; Plwmley case, 226 U. S. 545. The plaintiff made requests for extensions in many instances, and while action upon them was generally deferred until the time for final settlement, this course is not an unusual one. The plaintiff was permitted to proceed, and was willing to. continue with the work and await action on matters of extension. These,,were duly considered by the tribunal *141 raised up for that purpose by the contract. Before final action in the matter, the department caused a board to be organized to investigate the facts and report its findings. Both parties were heard by the board. Its carefully prepared, elaborate, and detailed report in writing evidences the most careful consideration of the many reasons assigned by plaintiff’s representatives, and opposed in many instances by the defendant’s officer in charge, for its claims to extensions of time. The plaintiff or its representatives were given access by the board to all records or information in the Government’s possession affecting the questions at issue, and the board’s report was approved by the proper authorities. There is not a suggestion by plaintiff of any bad faith on the part of the board or bureau, nor is there anything in the record upon which any such suggestion could be based.
It will be noted that the contract provisions require the plaintiff to request an extension within a stated period and that its failure to do this is a waiver of any right to an extension. Generally speaking, and as shown in the findings, requests for extensions were duly made. There is a distinction, however, to be observed growing out of the facts applicable to the particular contract, and it is illustrated by the facts applicable to the plaintiff’s first contract (No. 2713) calling for 22 buildings, of which some 14 were wholly or in part completed. The work was to be completed as to five of these houses within 70 calendar days “ to be reckoned from the date a copy of this contract is delivered ” to plaintiff. One additional building was to be completed every three and one-half days thereafter. Seventy days from the date the copy was delivered fixed the date for completing the five houses to' be on March 4. But the places where the buildings were to be located were not designated by defendant’s agents until June following. Therefore, before any locations were given the time within which the contract required all of the buildings to be completed had long since expired. The locations as finally adopted were upon lands which the Government acquired after the contract dates had expired.
The question therefore is whether, under these facts, there could be any liquidated damages assessed against the plaintiff. The contract fixed a date in March for completing five *142 houses, and when plaintiff was prevented from beginning work until after that date the time provision was waived; and unless the contract provide some method, or the parties agree upon one, for fixing another date, the liquidated damage clause is turned loose. The delay by the defendant, extended as it was over the entire period prescribed by the work, annulled any obligation for liquidated damages and remitted the defendant to proof of damages. United Engineering & Contracting Co. case, 234 U. S. 236, 243; Camden Iron Works case, 51 C. Cls. 9. The provision relative to seeking an extension and giving the reason therefor can not be applied to the situation thus developed. That provision is operative where, after being permitted to begin work, something occurs which the contractor sees or supposes may produce delay and give cause for an extension of time within which to complete the work. And where before the date fixed for completion the actual work is begun or permitted to proceed, then by the terms of the contract itself it becomes obligatory upon the contractor to request an extension, and he waives any right thereto if he fail to make such request. And, on the other hand, if he make the request in time, the contract provides that the bureau shall finally determine his right in that regard.
It follows that in the instance mentioned (contract 2713), and in several other like instances set forth in the findings, there should not be assessed any liquidated damages. In other instances where the plaintiff delayed completing the work, but was also granted extensions covering parts of the delay, the assessment of liquidated damages was proper, and the action of the department is conclusive.
It follows that the amount of liquidated damages with which plaintiff was charged should be reduced in accordance with the views we have expressed, and deducted from the sum otherwise admittedly due the plaintiff, and for this balance and other items mentioned and allowed the plaintiff should have judgment.
The plaintiff is entitled to recover the following sums: Finding II, $20,386.20; Finding III, $56,999.84; Finding V, $2,032.51; Finding VIII, $1,633.57; Finding XXV, $44,-878.90, aggregating the sum of $125,931.02, subject to deduc- *143 tdons on account of liquidated damages due the defendant as follows: Under Finding X, $2,260; under Finding XI, $860; under Finding XIII, $4,725; under Finding XIV, $1,375, $2,200, and $2,750; under Finding XV, $90; under Finding XVI, $3,350; under Finding XVII, $1,200; under Finding XIX, $155 and $400; under Finding XX, $1,350; under Finding XXI, $220; under Finding XXII, $285, making an aggregate sum on account of liquidated damages properly chargeable against plaintiff of $21,220, which, deducted from said sum of $125,931.02 due plaintiff, leaves a balance of $104,711.02 which the plaintiff is entitled to recover.
Graham, Judge; Hat, Judge; DowNey, Judge; and Booth, Judge, concur.