HANSEN & ROWLAND, Inc., et al. v. FIDELITY & DEPOSIT CO. OF MARYLAND.
No. 7353.

Circuit Court of Appeals, Ninth Circuit.
July 11, 1934.

John Lichty, of Portland, Or., for Fidelity & Deposit Co.

Charles T. Peterson, of Tacoma, Wash., and James L. Conley, of Portland, Or., for Hansen & Rowland, Inc., and another.

Before WILBUR, SAWTELLE, and GARRECHT, Circuit Judges.

SAWTELLE, Circuit Judge.

The plaintiff Hansen & Rowland, Inc., is a Washington corporation, with its principal office in Tacoma, Wash., and is engaged in a general insurance agency business. In October, 1919, the company, in addition to its principal office, operated a branch in Seattle, Wash., and also was interested in several subsidiary corporations in Tacoma.

On October 24, 1919, the Fidelity & Deposit Company of Maryland, hereinafter referred to as the defendant, executed and delivered to Hansen & Rowland, hereinafter referred to as the parent company, a "position form of fidelity schedule bond" or "position bond." This bond insured the parent company "and/or its Subsidiary Companies, of Tacoma, Washington, (hereinafter called employer)" against loss through the dishonesty of their employees. Attached to the bond was a "schedule of positions covered hereunder," with the respective amounts of coverage, but listing no names of individuals occupying the positions.

The bond covers losses caused by the acts of "any person now or hereafter filling any office or position named in the schedule here-

to attached or added thereto by acceptance notice as hereinafter provided," with the condition that such acts must occur "before the Employer shall become aware of any default on the part of such person," and must be "discovered before the expiration of two years from the termination of the employment of such person or the cancellation of this bond as an entirety," etc.

In 1921, the parent company formed a subsidiary corporation, Thieme, Morris, Hansen & Rowland, Inc., of Seattle, Wash., and, by an "addition notice," requested the defendant to amend the coverage of its bond so as to include the new company as well as the parent company, "and/or their respective subsidiary Companies, Tacoma and Seattle." This was done by rider. H. T. Hansen, president of the parent company, testified that the purpose of the rider was to change the obligee to include subsidiaries in Seattle.

In 1929, the parent company caused a corporation to be formed in Portland, Or., called the "Irving L. Webster Company, Inc." On December 6, 1929, the parent company requested the defendant to add the following positions to the bond, effective as of December 1, 1929:

"President, Portland, Ore., $10,000.00
"Vice-Pres., Portland, Ore., 5,000.00
"Secretary, Portland, Ore., 10,000.00
"Asst. Secy. Portland, Ore., 5,000.00"

This was done. The name of the Irving L. Webster Company, one of the plaintiffs, and hereinafter to be referred to as the Webster Company, did not appear either in the addition notice sent out by the parent company or in the "acceptance notice" sent by the defendant to the parent company.

On September 27, 1930, the first blanket position bond was terminated, and a new bond of the same kind was issued by the defendant, effective as of that date, insuring the parent Company "and/or H. T. Hansen and/or I. C. Rowland and/or any and all of their or either of their subsidiary and/or affiliated corporation and/or institutions located in Tacoma and elsewhere, hereinafter referred to as the Insured, against loss through larceny," etc., "on the part of any Employee of the Insured."

Hansen testified: "That the first time the name of Irving L. Webster Co., Inc., was referred to, or had ever appeared on the bond, was at this time, when plaintiff's letter of December 1st, 1930, was written." This, however, seems to be an error; for, as the defendant itself points out in its brief, "in the sched-

ule attached to this bond," the Webster Company's name first appeared. As we have seen, the second bond bore the date of September 27, 1930, and the name of the Webster Company appears *above that date*. Furthermore, the names of the Webster Company and of its various officers, with the names of the positions that they occupied, are to be found in a letter from the parent company to the defendant, dated November 13, 1930.

In this second bond, there was a primary coverage of $5,000 and an excess coverage of $10,000 on the president of the Webster Company, making a total of $15,000.

Like the first bond, in its limitation as to the time for discovery, the second contained the provision that the coverage was only for losses "discovered and reported to the Underwriter not later than two (2) years after the termination of this bond," etc.

Attached to the *second* bond was a "superseded suretyship rider," around which much of the controversy in the instant case is centered. The terms of the rider, in so far as they are material herein, were as follows:

"Whereas, the Employer has been carrying fidelity suretyship as follows: [Here the first bond was referred to] and whereas, said fidelity suretyship, as of the effective date of the attached bond, has been canceled or allowed to expire, or has been terminated by agreement, as is evidenced by the issuance and acceptance of the attached bond and this rider; and whereas said fidelity suretyship may provide that any loss thereunder shall be discovered, or claim thereunder shall be filed within a certain period after the expiration, cancelation or termination thereof, now, therefore, it is hereby understood and agreed as follows:

"(1) That the attached bond shall be construed to cover, subject to its terms, conditions and limitations, any loss or losses which may have been caused under said fidelity suretyship by the/any 'Employee' and which shall be discovered (after the expiration of any such period, or if there be no such period, after the bar of the statute of limitations, and) before the expiration of the time limited in the attached bond for the discovery of loss thereunder, and which would have been recoverable under said fidelity suretyship, had it continued in force, and also under the attached bond, had such loss or losses occurred during the currency thereof.

"(2) That nothing herein contained shall be construed to render the Fidelity liable under the attached bond for a larger amount on account of any loss or losses under said fideli-

ty suretyship than would have been recoverable thereunder had it continued in force, or to increase the time for discovering, or making claim for, loss under said fidelity suretyship beyond what would have been the time, had it continued in force.

"(3) That the aggregate liability of the Fidelity under said fidelity suretyship and the attached bond, on account of any loss or losses caused by the/any 'Employee' whether sustained under said fidelity suretyship or under the attached bond, or partly under each, shall, in no event, exceed the larger or largest of the amounts carried under said fidelity suretyship and under the attached bond on such 'Employee'."

On April 20, 1931, the parent company sold its 162 shares of stock, including 4 directors' qualifying shares, in the Irving L. Webster corporation to Irving L. Webster, who was the president of the latter company, for "the same price they [the parent company] paid for them, and received payment in full." During the period in which the parent company owned stock in the Webster Company, from November 20, 1919 to April 20, 1931, there was a total of 262 shares of outstanding stock in the latter company.

On April 20, 1931, the same day on which the parent company sold its shares in the Webster Company, the coverage of the second bond, as to the Webster Company, was canceled.

In the fall of 1931, officers of the parent company and the Webster Company began to suspect that there had been misapplication of the latter company's funds. As a result, an audit was made, and it was thereafter discovered that Webster, without authority, had overdrawn his account with the corporation in the amount of $15,848.23 between December 13, 1929, and September 18, 1930, and in the amount of $7,942.93 between October 3, 1930, and April 18, 1931. The exact amount of these "irregularities" is established by stipulation of the parties.

The parent company then notified the defendant of the unauthorized withdrawals, and a series of letters was exchanged, terminating in a proof of loss, whereby the two plaintiffs herein jointly made claim upon the defendant for the loss incurred by such overdrafts. Upon the defendant's refusal to recognize the validity of the claim, the present law action was instituted.

In their complaint, the plaintiffs recognize that they cannot recover more than $10,000 of the above $15,848.23 overdraft occurring during the period of the first bond, but they

do claim to recover the entire amount of $7,-942.93 occurring during the period that the second bond was in force, notwithstanding the apparent limitation of the superseded surety-ship rider to the amount of $15,000 gross.

The defendant offered no evidence and, at the close of the plaintiffs' case, all parties moved for a directed verdict. The court directed a verdict for the plaintiffs on the first bond and cause of action in the amount of $7,057.07, and on the second bond and cause of action, in the amount of $7,942.93; the total of the principal being $15,000. Judgment was entered accordingly.

The defendant has appealed for a reversal of the judgment in its entirety, while the plaintiffs filed a cross-appeal, complaining that final judgment had been entered on their behalf in an amount less than prayed for in their complaint; that is to say, that the court erred in directing the jury to return a verdict for $7,057.07 on the first cause of action, instead of for $10,000, as prayed for.

Although the defendant filed fourteen assignments of error, it subdivides its argument into three headings, as follows:

1. The parent company proved no loss for acts within the terms of either bond, which would support a judgment in its favor.

2. Neither of the bonds was taken for the protection of the subsidiary, the Webster Company, as a separate entity, and when the relation of subsidiary to the parent company terminated, the bond ceased to afford protection to the subsidiary.

3. The first bond is not broad enough to include employees of a subsidiary in Portland, Or.

As we apprehend the position of the defendant, it seeks to impale its adversaries upon the horns of the following dilemma:

1. The *parent* company cannot recover anything, because it has ceased to have an interest in its former subsidiary—although the admitted loss occurred during the existence of the corporate interrelationship—and because it has proved no loss for acts within the terms of either bond.

2. The *subsidiary* company cannot recover anything, because, at the time of the filing of the action in the court below, the relationship to the parent company had ceased.

In other words, if this dilemma is successful in its purpose, neither corporation can recover for an admitted loss of a type specifically covered by two admittedly lawful and valid contracts of fidelity suretyship, on which the required premium was admittedly paid, and under which proof of loss was made with a promptness that the defendant does not question.

We seriously doubt whether any court of law could lend itself to such a remarkable proposition.

We will first dispose of the argument that neither parent nor subsidiary can recover because, at the time suit was filed, the relationship had terminated.

It is primer law, of course, that the rights of parties under a contract are to be measured by what occurs during the life of the contract, and not by what may happen after the contract has terminated.

This fundamental principle applies to insurance, of which fidelity guaranty is a part. 1 Couch on Insurance, § 26; Cooley's Briefs on Insurance, vol. 1, p. 320, and vol. 2, pp. 969 and 988.

In Cooley's Briefs, vol. 2, at page 969, supra, the following statement is found, citing, among many others, the case of American Surety Company v. Pauly, 170 U. S. 133, 144, 18 S. Ct. 552, 42 L. Ed. 977: "As contracts indemnifying against loss by the defalcations of employes, by the insolvency of debtors, or by defects in titles are essentially contracts of insurance, they are to be construed in accordance with the same general rules as are applicable to other contracts of insurance."

In section 303 of the volume just cited, Couch says: "Unquestionably, it is sufficient that the insured had an insurable interest at the time the policy was obtained, which interest was still existent at the time of the loss * * *. And since the right to indemnity accrues as of the time of the loss, the fact that insured thereafter parts with his interest, or assigns the policy, does not defeat recovery."

Accordingly, we do not believe that the sale of the parent company's stock in the Webster company has deprived either company of the right to sue for losses occurring while the bonds were in force and while the relation of parent and subsidiary subsisted.

And, as pointed out by Couch, op. cit., vol. 2, § 426, a stockholder in a private corporation has an insurable interest in the corporate property, "to the extent of his interest, for the actual loss which he might sustain by the injury or destruction of said property."

Counsel for defendant, in their reply brief, accordingly insist that any protection that the parent company "could possibly"

receive from the first bond would be measured by "the value of the stock of Hansen & Rowland in [the] subsidiary, and this, of course, would be accomplished by reimbursing the subsidiary for the amount of such embezzlement, and would not entitle Hansen & Rowland to a direct judgment." But, as we have seen, according to the defendant the subsidiary could not recover, either, because the relation of parent and subsidiary had terminated at the time the suit was instituted—despite the fact that the loss sued for occurred while the bonds were in force and the relationship between the two companies existed.

Pursuing its argument that the parent company's loss would be measured by the value of its stock in the subsidiary, the defendant contends that, "The record is entirely silent on any proof as to the actual value of Hansen & Rowland's stock in Irving L. Webster Co., Inc., at the time of its transfer and purchase by Irving L. Webster," and that, "For aught we know, Irving L. Webster paid them the full value for their stock, assuming that the indebtedness from himself to the corporation for withdrawals was a valid collectible asset, and if this be true there certainly was no loss occasioned to them as stockholders by virtue of his excessive withdrawals."

It is to be observed that the defendant is merely speculating as to the "full value" of the stock in the Webster company, at the time that it was sold to Webster. If they are claiming this possible "full value" as an offset, counsel for the defendant have not established it by any proof whatsoever.

Furthermore, it is self-evident that a peculation of more than $15,000 by the president of a company would assuredly have some depressing effect upon the value of its stock.

Finally, the defendant's entire argument overlooks the fact that we are not here concerned with a controversy as between the parent company and the subsidiary company as to how the principal of the bonds shall be divided between them. The bonds protected them jointly and severally; they have brought joint suit; and they have obtained a joint judgment. The loss has been shared between them, and has fallen upon no one else. If one company has been partly protected, by stock sale or otherwise, a corresponding burden has been borne by the other. The stubborn fact remains that $15,000 has been wrongfully taken from the Webster company, and that *both* the parent company and the subsidiary company, jointly and severally, have been insured against precisely that type of loss. No amount of rhetoric can whittle down by one penny the *joint* loss sustained by the parent and the subsidiary. The money is gone; the part of it that one company has not lost, the other has lost. Jointly they were indemnified, and jointly they are suing, for but a single satisfaction.

Particularly apposite in this connection is the language of Professor Cooley in volume 2, op. cit., at page 998: "If one construction of an insurance policy would involve hardship or absurdity or contradict its general purpose, this fact is strong evidence that such a construction was not intended by the parties, especially where it is open to a reasonable construction consonant with their general purpose."

We therefore arrive at the conclusion that the *parent* company was indemnified by *both* bonds for the type of loss that was admittedly suffered in the instant case.

Next we advance to the contention made by the defendant that, in any event, the subsidiary company cannot recover on the first bond because it is not specifically named therein as obligee.

As we have seen, in the first bond the name of the Webster Company did not in fact appear, but both the addition notice sent out by the parent company and the acceptance notice issued by the defendant referred to certain positions in Portland, with the coverage assigned to each. The plaintiffs, however, for the purpose of showing a "course of dealing" introduced documents showing that it was the practice of both parties merely to designate the positions and the cities in which they were occupied. In other words, neither the employer nor the employee was designated by name.

It is true that when Thieme, Morris, Hansen & Rowland was incorporated, a rider setting forth the name of the new company was made out by the defendant. Hansen testified that the purpose of the rider was to change the name of the obligee in the first bond, but that when the Webster company was formed, the parent company did not again apply for a rider to include the Portland subsidiaries. Hansen also testified, however, that it was not the practice of his company "in making reports for deductions and additions to designate the corporation that the party was employed by; that the acceptance, as issued by the defendant, did not designate the corporation unless they were designated on the notice that was sent to them; that there may have been one or two designations"; that the defendant "just copied off what Hansen & Rowland wrote to them; that they had no notice

or knowledge except what was given in the application; * * * that the defendant never asked for any additional information."

Our examination of the various exhibits has convinced us that the course of dealing between the parties does indicate that it was not the practice of plaintiffs or defendant to specify the names of the various subsidiaries, even though that was done in an isolated instance. Hansen's testimony, which we have quoted above, confirms this inference. The defendant introduced no exhibits of its own, and did not contradict Hansen; we must therefore accept the plaintiffs' exhibits and Hansen's testimony as accurately reflecting the course of dealing between the parties.

It must be remembered that the first bond itself provides for coverage for "any person now or hereafter filling any office or position named in the schedule hereto attached or added thereto by acceptance notice as hereinafter provided, * * * not exceeding, however, the sum set opposite the name of such office or position in said schedule or in said acceptance notice." This language indicates that the surety's main concern was the name of the "office or position" and the amount of coverage for each, and that it was not particularly interested in corporate entities, so long as such entities were in fact subsidiaries or affiliates of the parent company.

That it is proper for a court to inquire as to what the parties regarded as material factors in their contract is indicated in the case of Sales Corp. v. United States Fidelity & Guaranty Co., 215 Ala. 198, 110 So. 277, 278:

"Looking only at the designations of position and location in the schedule, we would be inclined to hold that the location named as to each of the seven employees included in the guaranty was intended to be definitive and not descriptive merely; and hence that a claim for indemnity under the bond should be limited, as to each employee, to his services in the conduct of a business at the location specified for him.

"But a comprehensive view of the entire document leads us to a different conclusion. It contains provisions permitting 'interchanges or substitutions among any of the employees,' provided the amount of liability should not be increased as to any employee; and, again, no distinction is made between Birmingham, Montgomery, Mobile, Dothan, and Oxford (or Anniston), as to the amount of the guarantor's liability or the amount of the premium paid by the insured.

"Very clearly, the contract of guaranty did not contemplate, as a material factor, the location of Sneed's service at Oxford rather than at Anniston. The material factors were the personality of the manager and the character of his service; and it was competent for the employer-guarantee to show that it had no business at Oxford, and that the employee was conducting the business in the adjoining city of Anniston, and therefore that the Anniston business was the one intended to be covered by the undertaking as to Sneed."

Paraphrasing the foregoing language, the contract of guaranty in the instant case did not contemplate, as a material factor, the identity of the subsidiary employing the unnamed incumbents of the positions covered by the various addition and acceptance notices. The material factors were the nature of the position and the amount of the coverage; and it is competent for the employer-guarantee to show that its only subsidiary at Portland carrying such positions was the Webster Company. This the plaintiffs proved. Since the first bond covered employees of the parent company "and/or its subsidiary companies, of Tacoma, Washington," and provided for additions to the positions originally listed it could make no difference in the risk whether the Portland Company was the parent concern or a subsidiary.

If it *had* made some difference to the defendant, it is fair to assume that it would have inquired, upon receiving the addition notice naming a full complement of officers at Portland. That notice was sufficient to put the defendant "on inquiry."

Doubt as to what subject-matter is covered by a bond should be resolved, where reasonably possible, in favor of the insured. In Couch, op. cit., vol. 3, § 743, the following language is used: "When property or a property right is the intended subject of insurance, its description should be so clearly set forth in the policy or certificate that the obligation assumed by the insured [insurer] is certain of ascertainment, either from the specific terms used, or by relation, or some other means or method of determining to what the contract applies should be prescribed. And, although this rule does not preclude resort to extrinsic evidence, where, *by reason of usage, ambiguity,* mistake, use of technical words, or otherwise, such evidence is rendered admissible, nevertheless care should always be taken, in describing the subject of insurance, to use such words as that neither party shall have it in his power to render the contract inoperative, or to enlarge or diminish its coverage, according as personal interest may dictate. * * * *Of course, in case of*

*doubt as to what property is covered, the construction will favor the insured where reasonably possible.* Furthermore, property which would reasonably be included in the description is covered, and if the insurers intend otherwise, it should be excluded by proper terms, or *they should insist upon a representation as to the character of the property,* or some warranty in regard to it, which would prevent the policy attaching." (Italics our own.)

See also American Surety Co. v. Pauly, supra, 170 U. S. 133, 18 S. Ct. 552, 42 L. Ed. 977.

 And even as to *material* facts, the insurer may waive his right to disclosure by his neglect to make inquiries as to data "concerning which he has been distinctly put on inquiry by the facts stated." Couch, op. cit., vol. 3, § 780. If the defendant had any doubt as to what corporation was being covered by the addition and acceptance notices in question, it should have asked. But, as we have said, we do not believe that it regarded this detail as material.

Accordingly, we are of the opinion that the plaintiffs are entitled to recover under both bonds, as a result of Webster's misappropriation.

 We turn next to a consideration of the plaintiffs' cross-appeal, which presents the question of whether or not the court below erred in refusing to direct a verdict in favor of the plaintiffs in the full principal sum of $10,000 on the first bond, instead of for the sum of only $7,057.07.

In other words, was the coverage under *both* bonds limited to a maximum of $15,000, which, as we have seen, was the amount awarded by the lower court?

The determination of this question depends upon the construction placed upon the superseded suretyship rider, the full text of which we have already set out.

The pivotal paragraph of the rider is the third, in which it is stated that "the aggregate liability" of the defendant under both bonds, for any loss, whether sustained under the first bond or the second bond, or partly under each, "shall, in no event, exceed the larger or largest of the amounts carried" under both bonds.

We do not believe that any finespun reasoning need be indulged in to arrive at the conclusion that the above paragraph was intended to limit the defendant's liability, in *any* event, to $15,000. In other words, the defendant's liability, under both bonds, was not to exceed the "aggregate," or total, of $15,000; for, as we have seen, the coverage under the first bond was for $10,000, and under the second, for $15,000. But for paragraph 3, the defendant's aggregate liability could have been construed to have been as high as $25,000, had losses reaching that amount been suffered during the lives of the two bonds. The defendant had the right to limit its liability as it did, by paragraph 3.

We find the terms "aggregate," "larger," and "largest" used elsewhere in the two bonds clearly in the same sense as that contended for by the defendant in connection with paragraph 3 of the rider. For example, in paragraph 8 of the first bond, the following language is used: "That in case of losses in two or more positions covered hereunder caused by the same person filling such offices of [or] positions at the same time, or at different times, the Surety shall not be liable on account of such losses for a greater sum than the larger or largest of the amounts set opposite such offices," etc.

Surely we can find no ambiguity in the foregoing paragraph. Nor is there any obscurity in paragraph 2 of the "Excess Indemnity Endorsement" in the second bond: "It is further agreed that the liability of the Underwriter on account of any one Employee in any one or more of such positions (in the original or an increased or decreased amount) shall not exceed the largest single amount of indemnity on any one position occupied by such Employee."

Or in the annual premium list offered in evidence by the plaintiff: " * * * in case the amount formerly carried on any employee shall be larger or smaller than the amount set opposite the name of such employee in said list, the former amount shall be deemed to be increased or decreased accordingly, effective as of said last mentioned date; provided that in case of any such increase or decrease the liability of [the defendant] on account of such employee shall not exceed in the aggregate the larger of said amounts."

We believe that the plain intent of the language used in paragraph 3 of the rider was to limit the defendant's total liability to the maximum coverage of the larger of the two bonds; namely, the second, or $15,000.

We have examined the other assignments, and find no error in the court's rulings during progress of the trial.

Accordingly, the judgment is affirmed, both on the defendant's appeal and on the plaintiffs' cross-appeal.