## CONSOLIDATED FISHERIES CO. v. FAIRBANKS, MORSE & CO.

### No. 10466.

United States Court of Appeals Third Circuit.

Argued Dec. 20, 1951.

Jan. 22, 1952.

Leonard J. Schwartz, Philadelphia, Pa. (Fox, Rothschild, O'Brien & Frankel, Philadelphia, Pa., on the brief), for appellant.

Charles J. Biddle, Philadelphia, Pa. (Hayward H. Coburn, Frederick R. Drayton, Jr., Philadelphia, Pa., on the brief), for appellee.

Before McLAUGHLIN, KALODNER and STALEY, Circuit Judges.

STALEY, Circuit Judge.

This is a diversity action brought by Consolidated Fisheries Company, a Delaware corporation, against Fairbanks, Morse & Co., an Illinois corporation, wherein plaintiff seeks to recover damages for an alleged breach of warranty growing out of the sale of a diesel engine.[1] Defendant counterclaimed for the unpaid balance of the purchase price. After both parties had presented their evidence, the court instructed the jury to return a special verdict. Judgment was subsequently entered by the trial judge in favor of defendant both on the complaint and on the counterclaim. This appeal followed.

Plaintiff is the owner of numerous fishing vessels. Contemplating the conversion of its vessel, the Medric, from steam power to diesel power, plaintiff consulted representatives of defendant. Conversations bore fruit in agreement. A written contract was entered into between the parties in January, 1948, whereby defendant agreed to deliver and plaintiff agreed to purchase a 6 cylinder, Model 37F16, marine diesel engine. An independent shipyard employed by plaintiff removed the old engine, prepared new foundations, and installed the diesel engine and its accessories. After several runs, it became apparent that the engine could not be used without causing substantial damage to the vessel. That the consequences were disastrous is not disputed; the cause of the disaster and the

extent of defendant's liability were the issues before the district court.

Plaintiff there attempted to prove that defendant's agents had made representations that the engine sold would be suitable for use on the Medric and that it was in fact completely unsuitable.[2] The vital defect in the engine, according to the testimony of plaintiff's witnesses, is that the engine was so designed as to be incapable of being mounted rigidly and integrally with the thrust bearing. The jury found that agents of defendant had advised plaintiff that the engine in question would be suitable for the Medric and that the engine was not in fact reasonably fit for such use. The trial judge held, however, that the written contract operated to relieve defendant of any liability for breach of warranty that the engine would be suitable for use on the Medric.

Klaxon Co. v. Stentor Electric Mfg. Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 directs us to follow the law of Pennsylvania, including its conflict of laws rules. Several states have had contact with the transaction here involved.[3] Since this decision rests on elementary principles of contract interpretation and the result would in no way be affected by the choice of law, it is unnecessary for us to decide which law a Pennsylvania court would apply.

Let us turn to the contract. Expressly incorporated into it is "Specification No. 1" which describes exactly what defendant agrees to deliver. The relevant part of the specification reads as follows:

1. Plaintiff's amended complaint was in three counts. The first alleged a breach of warranty; the second count was predicated on alleged negligent installation of the engine under supervision of defendant's agents; and the third count sought damages based on the late delivery of the engine by defendant. Plaintiff subsequently amended its amended complaint, adding a count sounding in tort which alleged that defendant had negligently recommended the engine in question as suitable for the Medric. The second and third counts were not seriously pressed below. The fourth count was dropped on appeal in view of our decision in Fairbanks, Morse & Co. v.

Consolidated Fisheries Co., 3 Cir., 1951, 190 F.2d 817.

2. One of the principal factual issues before the jury was whether the defendant had delivered a marine diesel engine in accordance with the contract. The jury resolved this point in favor of the defendant.

3. The preliminary negotiations between the parties occurred in Delaware, but the contract was apparently made in New York. The engine was shipped F.O.B. defendant's plant in Wisconsin to the Norfolk, Va., shipyard where it was installed in the Medric under the supervision of defendant's engineer.

"Main Propulsion Machinery

"1—Fairbanks Morse 6 cylinder Model 37F16, 16″ bore x 20″ stroke, two cycle, solid injection, pump scavenging Marine Diesel engine, *rated 1200 HP* @ 300 RPM, starboard rotation. Engine to be fitted or furnished with the following equipment: * * *." (Emphasis supplied.)

The crucial sections of the contract relied on by defendant to limit its liability are as follows:

Section 9: "It is expressly understood and agreed * * * that the Company shall not be liable or responsible for the use or purpose for which the machinery or materials are put or intended, nor for any damages of any character, whether original or consequential, arising out of the possession, use, defect, or failure of said machinery or materials, except solely as, and to the extent as, expressly set forth in this proposal."

Section 10: "It is likewise agreed that this proposal sets forth all representations, agreements, understandings, warranties, guaranties, terms, and conditions in anywise pertaining to the subject matter hereof, whether oral or written, express or implied, contractual, statutory, arising by operation of law, or otherwise, all others being expressly hereby waived or excluded."

On appeal, plaintiff has remodeled its legal position advanced in the district court. In order to pierce the heavy armor of the disclaimer clauses, plaintiff relies on the description of the engine in the opening part of the contract as 1200 H.P. at 300 R.P.M., and on a statement in the contract that the engine is for use on the vessel Medric. From this, plaintiff spells out an express contractual provision that the engine will deliver 1200 H.P. on the Medric and, further, that such power will be produced without damaging the ship.

We cannot accept this interpretation. A complete reading of the contract makes the intent manifested therein abundantly clear. There is no attempt in the opening part of the contract to accurately describe the engine; the description contained there is in bold strokes, and we are expressly referred to the specification for a detailed description of the machinery covered by the contract. The engine is described in the specification as "rated 1200 HP @ 300 RPM." This dispels whatever merit there may have been to the argument advanced for plaintiff. The term "rated" necessarily refers to the standard rating of an engine, which is the horsepower capacity of the engine under specified conditions according to a predetermined test.[4] This description of the engine in terms of rated horsepower must be read in the light of Section 2 of the contract, which provides that the "engine specified herein shall be tested by Company [defendant] at its factory before shipment, and the Company guarantees said engine shall develop 1200 actual horsepower at such test." The two provisions read together thus make it apparent that "rated 1200 HP" means that the engine shall be capable of developing 1200 H.P. at the factory test.[5]

4. Plaintiff made no attempt to prove the meaning of "rated" as used in the specification. "Marine Diesel Engine Standards," a 1940 publication of the Diesel Engine Manufacturers Association, informs us that the standard rating of a marine diesel engine, as adopted by the members of that association, "is the net brake-horsepower that the engine will deliver continuously with atmospheric temperature not over 90 degrees F. and barometric pressure not less than 29 inches of mercury." (p. 25) The standard for net brake-horsepower is defined as "horsepower measured by a dynanometer at the engine coupling, without correction for power required by auxiliaries which may or may not be driven by the engine. (*Ibid.*)

5. Even were we to accept plaintiff's interpretation of the contract that the engine must develop 1200 H.P. on the Medric, it would not necessarily follow that defendant likewise warranted the use of such power without damage to the ship. This is the same argument plaintiff addressed to the district court, adorned in a somewhat different garb. A warranty that the engine will produce 1200 H.P. on the Medric without damaging the ship is in effect a warranty that the engine is suitable for use on the Medric. But Section 9 of the contract specifically states that defendant is not liable for the use or purpose for which the machinery is intended, except as *expressly* set forth in the contract. It can hardly be contended that the con-

■■ The statement in the contract that the engine is for use on the Medric likewise offers plaintiff no assistance. The purpose of such language is clear. Frequent reference is made in the contract to the Medric; in fact, the vessel is a party to the contract. Plaintiff covenants that the vessel is free and clear of any liens and encumbrances, and agrees to execute a first preferred ship mortgage on the vessel to secure payment of the purchase price of the engine. Thus, upon default by plaintiff, defendant can enforce the mortgage lien by a suit in rem in admiralty.[6]

We conclude that defendant is not liable for the failure of the engine to produce 1200 H.P. without damage to the vessel, and that the district court properly entered judgment in favor of defendant on the complaint and counterclaim.

The judgment of the district court will be affirmed.

---

tract contains an express statement that the engine will be suitable for use on the Medric.

6. 41 Stat. 1003, 46 U.S.C.A. § 951.