The **PRUDENTIAL INSURANCE COMPANY OF AMERICA, a corporation,** Plaintiff,

v.

**Mary Theresa HEYN, a Minor, by Mary K. Heyn, her guardian, Michael Heyn, a Minor, by Mary K. Heyn, his guardian, Fayette National Bank and Trust Company, Trustee, Fayette National Bank and Trust Company, Guardian, Union Trust Company, Trustee, Fidelity Trust Company, Trustee, John Does I and II, Jane Does I and II, Hawk Company, Defendants.**

Civ. No. 1759–SD.

United States District Court
S. D. California, S. D.
March 19, 1956.

Gray, Cary, Ames & Frye, James W. Archer, Alfred S. Wilkins, San Diego, Cal., for plaintiff.

Swing, Scharnikow & Staniforth, Phil D. Swing, San Diego, Cal., for defendant Fayette Nat. Bank & Trust Co.

Stanford & McDonough, Huntington P. Bledsoe, San Diego, Cal., for claimants Heyn.

WEINBERGER, District Judge.

The question before the Court is whether the interest annually due under four insurance policies upon the life of the insured, Leo L. Heyn, shall be paid to Mary Theresa Heyn, and Michael Heyn, children of the insured, claimants herein, or to the Fayette National Bank and Trust Company, as Trustee (hereinafter called "Bank"), a claimant herein.

Briefs and written argument have been filed and counsel have stipulated that the matter may be submitted upon the pleadings, exhibits, and the following stipulated statement of facts, and the Court has so ordered.

### Statement of Facts.

On November 18, 1940, Leo L. Heyn made a declaration of trust (Bank Exhibit 3) wherein he stated he desired to create a trust for his two children; that at the time of the declaration, he was depositing 500 shares of stock and that it was his intention to add to said trust from time to time in stocks, monies and real estate. It was further stated:

"A complete record of all the assets of the Trust, including Corpus, dividends and disbursements will be found in a Ledger kept by me, together with an account, in a safety box in the Second National Bank, Uniontown, Pa., designated Leo L. Heyn, Trustee, and said Ledger will be a complete history of all the assets of said Trust for my children."

The Declaration further stated that the trust should be irrevocable, and for the time being would be administered by himself; it was further stated:

"In case of my death before I can make a proper assignment for a successor Trustee, said Trust shall be offered to the Union Trust Co. of Pittsburgh, Pa. and in case it is not accepted, the Fidelity Trust Co. of Pittsburgh, Pa."

The Declaration further provided that the income should be invested for his children, and should be divided equally between them when Michael should reach the age of thirty-five years, or if Michael should die, then when Mary Theresa should reach the age of thirty-five years.

On May 4, 1945, Mr. Heyn executed another document in the nature of a Declaration of Trust, wherein he mentioned that certain stocks and dividends had been set aside for his children and listed in a special ledger for that purpose; that the stocks would be sold and exchanged by him as trustee as circumstances demanded, and for that purpose would be held in his name; that the gifts were irrevocable and proper returns had been made and would continue to be made to the Government.

In 1947 four insurance policies of $10,000 each were issued by the Prudential Insurance Company of America upon the life of Leo L. Heyn. On the face of each, the date of October 27th is shown as the date of issue. Mary T. Heyn, one

of the minor claimants and daughter of the insured, is the beneficiary on two of the policies, and Michael Heyn, another minor claimant and son of the insured, is the beneficiary on two of the policies. These policies are in evidence.

From correspondence in evidence from the files of the Prudential Insurance Company, there appear statements of Company agents that originally Mr. Heyn's two minor children signed the applications for the insurance (Ex. Heyn "A"); the manager of the Denver Office, upon learning of this, talked with Mr. Heyn, and as a result, new applications were prepared and signed October 27, 1947, wherein Mr. Heyn signed the applications for the policies as "Leo L. Heyn, Trustee for Mary Theresa Heyn" and "Leo L. Heyn, Trustee for Michael H. Heyn." (Ex. Heyn "A") According to further correspondence in the Company files, the declaration of trust executed by Mr. Heyn, November 18, 1940 (Exhibit 3) was then submitted to the Company attorneys, who ruled that under the laws by which the declaration was governed, trust funds could not be used to pay the premiums on said policies. (Ex. Heyn "C").

It also appears that on October 27, 1947, Leo Heyn executed the assignments of the policies to "Leo L. Heyn, Trustee", though the assignments were not acknowledged before a notary until November 25, 1947, and were not filed in the Home Office of the Company until January 6, 1948. The assignments were made on printed forms prepared by the Company. (Bank Ex. 2).

Following the words of assignment, there appears the following:

"* * * and all rights, benefits, and advantages to be had or derived therefrom including, with limiting the generality of the foregoing, the right at any time to exercise the loan provisions thereof or to surrender the same for its cash value even though the assignment may be for collateral security only, all subject to the conditions of said Policy, and to any existing indebtedness to the Prudential Insurance Company on account of or secured by said Policy."

It next appears from the correspondence in evidence that after the Company attorneys decided the trust funds could not be used to pay for the policies, they suggested to Mr. Heyn that he execute a new declaration of trust which would permit such investment.

Under date of November 25, there appears from further correspondence in evidence a statement of a Company agent that Mr. Heyn declined to make any changes in the declaration of trust, and that "new applications on the individual form naming the children as beneficiaries" were signed and forwarded to the Home Office of the Company for approval. (Heyn Ex. "D").

These applications were evidently the ones upon which the policies were issued, and are attached to the policies, although one part of the application bears the date of October 27, 1947, and another part bears the date of October 17, 1947, the October 17 date evidently being the date upon which the insured was examined by a physician.

In the applications attached to the policies, it is specified that the beneficiary is to receive the proceeds under Option 2 of the policy which provides that the proceeds shall be paid to the beneficiary beginning immediately upon the death of the insured.

Under date of July 15, 1949, there appears Company correspondence to the effect that a Company agent in San Diego, California, forwarded a request that beneficiary settlement agreements should be prepared wherein the proceeds of the policies were to be held until the beneficiary should reach the age of 40 years, at which time the beneficiary could elect under certain options, and also, after which time, the beneficiary might withdraw certain sums at certain intervals. The question is also asked by the San Diego agent: "As we understand it, these policies were issued on the life of Leo L. Heyn and then assigned to him as Trustee. If so, does he sign the forms

as Trustee or as both Insured and Trustee?" Other correspondence, evidently from the home office, dated 7/21/49 reads in part: "Since this is an unusual set-up, we believe Mr. Heyn should sign both as Insured and as Trustee." (Heyn Ex. "E").

It then appears that a request to change beneficiary provision in the form shown on the policies was filed with the Company, dated August 8, 1949, and that such request was signed by Leo Heyn as insured, and by Leo Heyn as Trustee. (Heyn Ex. "F").

By this change in the beneficiary provision, it was provided that the Company should hold the proceeds of the policies under Option 3 of the policy and pay the interest to the beneficiary annually, until the beneficiary should attain the age of 40 years, after which such beneficiary might make withdrawals at certain intervals.

Under the heading "Provisions as to Modes of Settlement" on the face of the policy, preceding the enumeration of a number of options, of which "Option 2" and "Option 3" hereinbefore mentioned are two, there appears:

"None of the following Options shall apply or be available to an assignee, corporation, partnership, association, institution, trustee, executor, administrator * * *."

On October 9, 1951, Leo L. Heyn made a will. (A copy is in evidence as Exhibit 4.) (A codicil was executed on September 24, 1952, but its provisions have no bearing on the issues here before the Court.) The said will was probated as the last will and testament of Leo L. Heyn; a trust of the residue of his estate was created thereby for the benefit of his two children, and Fayette National Bank & Trust Company was named trustee, in the following language:

"All the rest, residue, and remainder of my estate, of whatever kind or character, and wheresoever situated, of which I die possessed, or to which I may in any manner be en-titled, or over which I may, at the time of my death have the power of appointment, I hereby devise, and bequeath to Fayette National Bank & Trust Company, of Uniontown, Pennsylvania, and its successors by merger, consolidation, or otherwise, in trust for my daughter, Mary Theresa, and my son, Michael, to hold, manage, and distribute as hereinafter provided."

It was also provided that certain payments should be made to each child from the trust estate created by the will when each child should reach the age of forty years.

The Declaration of Trust made by Mr. Heyn on November 18, 1940 was mentioned in the will, with the statement:

"* * * I, therefore, assign, transfer, and set over to said Fayette National Bank and Trust Company of Uniontown all of the assets of said Trust in accordance with the terms of said Trust Agreement. Such trust property and trust estate is excluded from the terms and provisions of this will and only such money, stocks, bonds, and other property not previously placed in trust for my said children at the time of my death is intended to be covered and disposed of by this will."

The will provided further as follows:

"I hereby nominate and appoint my sister-in-law, Gertrude Hotchkiss Heyn, as the guardian of my said children and their said estates and in the event she is unwilling or unable to act, then I nominate and appoint the Fayette National Bank & Trust Company of Uniontown, Pennsylvania, as such guardian."

Leo L. Heyn died April 2, 1954.

There is in evidence a certificate of the Register of Wills for Fayette County, Pennsylvania, to the effect that under the will of Leo L. Heyn the Fayette National Bank & Trust Company was appointed Testamentary Guardian and

was, as of the date of the certificate, August 3, 1954, acting as such trustee.

A similar certificate using the words "Testamentary Trustee" instead of "Testamentary Guardian" is also in evidence.

There is no evidence that the "Ledger" which the trustor, in the inter vivos trust stated would contain a list of the assets of the trust, mentioned the insurance policies. They were not listed by the Bank as an asset of the inter vivos trust when it filed its inventory as trustee; neither were these policies listed by the Bank when it filed its inventory as trustee of the residuary trust created by the will.

On December 13, 1951 Mary Kay Heyn, mother of the minor claimants and wife of Leo L. Heyn, secured a decree of separate maintenance and the divided custody of said minors, and on June 23, 1954, by the Superior Court of the State of California, County of San Diego, was appointed Guardian over the persons and estates of said minors, they being then, and now, living in the County of San Diego.

(This concludes the Statement of Facts.)

Since the wording of the policies and their applications are identical except that two of them name one child and two the other, and since the assignments for all four policies read the same, we shall, in the body of this opinion use the singular in most instances in referring to these documents.

It is the position of the Bank, first, that by his will Mr. Heyn appointed the Bank as guardian of his children and their said estates; that under Pennsylvania law, the testator might appoint "a testamentary guardian of the real or personal estate which he shall devise, bequeath or appoint to a minor", and that the words "or appoint" in the Pennsylvania law cover the insurance policies herein; that the Bank is the guardian of the estates of the children as far as such estates consist of property located outside of California, and that the income from such insurance policies should become a part of the estates of the children for which the Bank is responsible.

It is the second position of the Bank as set forth in its brief in the form of a letter dated December 7, 1955, that the inter-Company correspondence (designated by the Clerk as Heyn Exhibits A, B, C, D);

"Make it indisputably clear that all rights in and under the four policies were vested in 'Leo L. Heyn, Trustee' and that the trust referred to was and is the inter vivos trust set up by Mr. Heyn's declaration dated November 18, 1940 and now administered by the Fayette National Bank and Trust Company, successor trustee to Leo L. Heyn, Trustee, deceased."

While we believe the Bank has abandoned its first position in view of the above quoted and other language in said brief just mentioned we shall make a finding as to same because the Bank has included such contention in its answer.

The minor claimants take the position that the last beneficiary provision in the policy determines they shall receive the yearly income from the policies in accordance with the provision; that such provision had the effect of cancelling any other mode of payment, if the assignments could be classified as providing such; that if the testator ever intended that the proceeds of the policy should be administered as part of a trust, he abandoned that intention prior to his last change in the beneficiary provision.

In considering the issues involved in this case, it will be necessary for us to interpret the policy with the change of beneficiary provision, the assignment, the declaration of trust and the will.

It appears that the insured was residing in Colorado at the time the policy was delivered, and that the negotiations concerning the policy were had with a Colorado agent of the company. It also appears that the assignment was executed by the insured in Colorado. The change of beneficiary was executed by

the insured in California, while in his will, executed in California, the insured declared himself to be a resident of Pennsylvania, and a resident of Pennsylvania was appointed as executor and as trustee, though also in the will an ancillary executor was appointed, a resident of California.

■ An insurance policy is a contract, and a Federal Court in a diversity of citizenship case will look to the conflict of laws rule of the forum on the subject of contracts. Klaxon Company v. Stentor Electric Manufacturing Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477; Griffin v. McCoach, 313 U.S. 498, 503, 61 S.Ct. 1023, 85 L.Ed. 1481.

The California rule is stated in Section 1646 of the Civil Code of the State of California:

"A contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it is made."

Where was the contract involved here to be performed?

The policy recites that any amounts payable by the Company under the policy are to be payable at its Home Office, which is in New Jersey. The policy also recites that the premiums are to be payable at the Home Office, or to an authorized agent of the company. In New York Life Ins. Co. v. Waterman, 104 F. 2d 990, the Court of Appeals of the Ninth Circuit was considering the place of performance of a life insurance contract whose provisions for payment of benefits and payment of premiums were similar to those of the policy in this case. The Court indicated it took judicial notice that large insurance companies, as a general practice, had accredited agents for the receipt of premiums in states other than that of their home office and that the contract might be shown to be contemplated by the parties to be performed as to the payment of premiums in the state of delivery of the life insur-

ance policy as well as in the state of the home office. In Ostroff v. New York Life Ins. Co., 9 Cir., 104 F.2d 986, the same Court held that under a policy containing terms similar to those mentioned in the case just above discussed, the place of performance was both in New York (the state of the home office) and in California, where the insured paid the premiums.

In both cases the Court ruled that the greater part of the performance contemplated was the payment of premiums.

Since the insured was residing in Colorado at the time he made the application for the policy and evidently, from the inter-company correspondence, continued to reside there during the negotiations concerning the form of the policy, it might have been contemplated that the premiums were to be paid there. It also might have been contemplated that the insured would pay the premiums at the office of the company located in California, or Pennsylvania, in each of which states the insured resided for various periods.

Since we are not here concerned with whether premiums were paid, but are concerned with the payment of benefits by the Company, it might be argued that the interpretation of the insurance contract should come under the laws of the state where the latter portion of the performance was to be made, New Jersey.

Or, it might be argued that since the Court of Appeals of this Circuit has ruled that the greater number of the performances of the terms of an insurance policy is the repeated payments of premiums, New York Life Ins. Co. v. Waterman, supra, 104 F.2d at page 993, and the premiums might have been contemplated to be paid in any one or in the several states we have mentioned, this Court should adopt as the rule of reference, the law of place of making the contract. Such procedure was followed in Smith v. Onyx Oil and Chemical Company, 3 Cir., 1955, 218 F.2d 104, 110, 111:

"What shall the rule of reference be in such a case? It could be that

the question is to 'be chopped up into as many pieces as there are places for performance.' Goodrich, Conflict of Laws, 325 and note 65 (1949). But the courts, in cases where performance is called for in different states, show a strong tendency to refer the question to the law of the place of contracting. Thus, in Morgan v. New Orleans, M. & T. R. R. Co., C.C.La., 1876, 17 Fed.Cas. pages 754, 758, No. 9,804, Circuit Justice Bradley, when faced with this problem, stated: 'In this embarrassment, I do not know that I can do better than to fall back on the general rule that a contract is to be governed by the law of the place where it is made.' See also, Bernstein v. Lipper Mfg. Co., 1932, 307 Pa. 36, 160 A. 770; Oakes v. Chicago Fire Brick Co., 1944, 388 Ill. 474, 58 N.E.2d 460; Goodrich, Conflict of Laws, 325 (1949); 2 Rabel, The Conflict of Laws, 462–472 (1947)."

■ But what was the place of making? The general rule of law is that the place of contracting is the place where the last event necessary to make a contract occurs. See Restatement of Conflict of Laws, Sections 312, 313, 315, 318, and cases cited under California Annotations to Restatement of Conflict of Laws, Section 311.

■ The insurance policy with the application attached are construed together as they constitute one contract. Boyer v. United States Fidelity & Guaranty Co., 206 Cal. 273, 274 P. 57.

One portion of the application provides (Section 4) that unless the first full premium is paid at the time of making the application, the policy should take effect only when the Company approved the policy and the insured received it and paid the first premium while in good health. Another portion of the application provides (Section 5) that if at the time of signing the application the first full premium is paid, the insurance shall be deemed to have taken effect as of the date of Part 1 or 2 of the application, provided the application is approved and accepted by the Company at its Home Office in Newark, New Jersey.

The medical examination of the insured evidently occurred October 17, 1947 in Colorado; one portion of the application bears such date; another portion bears date of October 27, 1947, and the inter-office correspondence of the Company discloses that negotiations concerning the designation of beneficiaries and the form thereof were conducted between the Colorado agent, and the insured, in Colorado, until at least as late as November 25, 1947, before the initial beneficiary provision was inserted in the policy. With no evidence as to when the first premium was paid, or where it was paid, it is difficult to determine where the "last event necessary to make a contract" occurred.

■ The assignment was executed in Colorado. Under the California conflict of laws rule, it constituted a separate contract distinct from the contract of insurance, and was governed, as between the assignor and the assignee, by the law of the place where the assignment was made. New York Life Ins. Co. v. Dunlevy, 9 Cir., 1914, 214 F. 1, 4, affirmed 241 U.S. 518, 36 S.Ct. 613, 60 L. Ed. 1140; Dix v. Bank of California, D. C., 113 F.Supp. 823, 825, affirmed Dix v. Pineda, 9 Cir., 205 F.2d 957. As between successive assignees, according to Restatement, Conflict of Laws, 354, the law of the place of performance of the main contract is determinative.

Neither counsel has made an attempt to suggest for us a rule of reference in construing the insurance policy or the assignment; neither counsel has urged that the interpretation of any particular state court as to any particular point involved is at variance with the statutes or case law of another.

■ Our own research fails to disclose any conflict between the laws and reported decisions of the states we have

mentioned as having had contact with the transactions involved herein. This leaves us free to base our conclusions on elementary principles of contract interpretation common to all of those states; the result would in no way be affected by a choice of law. Consolidated Fisheries Co. v. Fairbanks, Morse & Company, 3 Cir., 193 F.2d 957, 958.

There can be no escape from the observation that the assignment by the insured to himself as trustee, with no mention of a beneficiary, nor any identification whatever of any trust, was ambiguous. The change in the beneficiary provision, after the making of the assignment, gave rise to another ambiguity. The fact that the insured chose a method of distribution of proceeds, which, by the terms of the policy expressly was made unavailable to a trustee, assignee, executor, etc., creates still another stumbling block in the path of one who would seek to interpret these documents entirely by what their faces disclose.

We feel justified, therefore, in considering in addition to the policy and the assignment, all the circumstances and matters mentioned in the Statement of Facts. This, especially, since both counsel have urged for attention the inter-company correspondence, the declaration of trust and the will, as showing the acts and intention of the insured and as indicative of the purposes of the contract and the circumstances surrounding its execution. See Sections 1647 Civil Code, California, and 1860, Code of Civil Procedure, California; Stinson v. New York Life Insurance Company, 83 U.S. App.D.C. 115, 167 F.2d 233, 235.

Also, in considering evidence outside the policy and assignment, we take note of the conduct of the parties, particularly the insured, at the time of making the contract and thereafter, before any controversy arose as to its meaning. As was stated by Chief Judge Yankwich of this District, speaking for the Court of Appeals of the Ninth Circuit, in Pacific Portland Cement Company v. Food Ma-

chinery & Chemical Corporation, 178 F. 2d 541, 554:

"A similar deduction is warranted if we consider the conduct of the parties subsequent to the execution of the contract and before the controversy arose. Such conduct is given due consideration in determining the meaning of a contract, because it may indicate the actual, practical construction which the parties have placed upon the contract. 17 C.J.S., Contracts, § 325; Restatement, Contracts, § 235(e); Retsloff v. Smith, 1926, 79 Cal.App. 443, 452–453, 249 P. 886; Tennant v. Wilde, 1929, 98 Cal.App. 437, 277 P. 137; * * *."

See also Brooklyn Life Insurance Company v. Dutcher, 95 U.S. 269, 24 L.Ed. 410; Lowrey v. Hawaii, 206 U.S. 206, 222, 27 S.Ct. 622, 51 L.Ed. 1026; Continental Assur. Co. v. Conroy, 3 Cir., 209 F.2d 539, 542.

In the insurance policy, the power to change the beneficiary was reserved to the insured by its terms; the beneficiary would receive the proceeds of the policy if it was in force at the time of the insured's death, with the beneficiary unchanged. In the meantime, the control of the insured was absolute, and he would assign the policy at will; the insured had the power, by assignment, to divest the beneficiary of all right to the proceeds of the policy, whether the nature of said right was a "vested" interest under New Jersey law, Phoenix Mutual Life Ins. Co. v. Connelly, 3 Cir., 188 F.2d 462, or Colorado law, Johnson v. New York Life Insurance Co., 56 Colo. 178, 138 P. 414, L.R.A.1916A, 868; Mutual Ben. Life Ins. Co. v. Ellis, 2 Cir., 125 F.2d 127, 131, 138 A.L.R. 1478, or a "mere expectancy" under California law, Morrison v. Mutual Life Ins. Co. of New York, 15 Cal.2d 579, 103 P.2d 963.

What was the effect of the assignment involved in this case?

We feel that the insured desired that the corpus of his estate should upon his death be placed beyond the reach of his

children (except such sums as might be necessary for their maintenance and education) until they were well beyond adult age. For this purpose he created the inter vivos trust.

We also believe that Mr. Heyn intended, during his *first* negotiations with the insurance company, to have the premiums paid on each of the policies from the assets of the inter vivos trust, and to make each policy a part of that trust. When the Company attorney ruled that this method of paying the premiums would not be permissible under the declaration of trust, the insured made the children beneficiaries under "Option 2" of the policy. With this option the proceeds would have been payable to the children within a period of five, ten, or twenty years, payments to begin immediately upon the death of the insured. It is possible that Mr. Heyn felt this method would not sufficiently postpone the distribution of the large sum payable under each policy, and therefore he executed the assignment to himself as trustee, intending perhaps later to list the policy as an asset of the inter vivos trust which he had set up for the children.

In the inter vivos declaration of trust set up in 1940, as has been mentioned in the Statement of Facts, the insured made it quite clear that the trust was irrevocable, and that the assets of the trust would be noted in a "complete record" and a "complete history" in a Ledger to be kept by him, together with an account, in a safety box in a certain bank. Again, in 1945, in another document similar to the first declaration of trust and supplemental thereto, Mr. Heyn mentioned the "special Ledger" as containing a record of the stocks, etc. that had been set aside for the children under the irrevocable trust, and stated that the proper returns had been made and would continue to be made to the Government as to the income, etc. from the trust.

In his will, executed in September of 1952, the insured again referred to the inter vivos trust, and again mentioned that he had invested money from time to time in stocks, bonds and other property which he had placed in trust for the benefit of his children "as set forth in that certain Declaration of Trust" * * * "to which Declaration of Trust reference is hereby made for the terms and conditions thereof and for a description of the trust estate covered by said trust."

It is doubtful if a man who managed his affairs with the precision displayed by Mr. Heyn, knowingly would leave any "loose ends" dangling to perplex court and counsel after his death. That he had advice of counsel in the preparation of his will in 1951 and the codicil in 1952, that at such times he was in full possession of his faculties, had complete knowledge of his assets, of his affairs, and of the inter vivos trust and was certain in his wishes regarding his children's participation in his estate, may be assumed from the phraseology of these documents. It is not likely he would overlook a "loose end" amounting to $40,000. He would have (a) entered each insurance policy in the "Ledger" as a part of the trust estate, or (b) changed the beneficiary in each policy to his estate, thus making each part of the residuary trust set up in the will, or, (c) made the Bank the beneficiary as trustee for the children, *unless he believed that he had already taken care of the matter in a manner calculated to protect the children's estates, as follows:*

In 1949, as the statement of fact shows, Mr. Heyn executed the change of beneficiary provision which remained in the policy at his death. By the terms of this change, under Option 3 the distribution of the corpus of the policy was postponed until the beneficiary should reach the age of forty years, and then the payments were to be made in installments, with the Company holding the proceeds and making payments. This beneficiary provision virtually established a trust in favor of the children, with the Company as trustee, and there was no necessity for the interposition of the Bank as a further trustee.

■ It would be unreasonable to impute to the insured an intent to place a trust upon a trust and thus subject the proceeds of the policy to the additional handling by the Bank after they became due the children under Option 3, and we shall not so construe the policy. As was said in Hansen & Rowland v. Fidelity & Deposit Co., 9 Cir., 72 F.2d 151, 155:

" 'If one construction of an insurance policy would involve a hardship or absurdity or contradict its general purpose, this fact is strong evidence that such a construction was not intended by the parties, especially where it is open to a reasonable construction consonant with their general purpose.' "

The request for change of beneficiary provision was signed by Mr. Heyn as insured and as trustee; whether there was a necessity for the signature as trustee was previously the subject of correspondence between the San Diego agent of the Company and the home office. The policy provided that any change in beneficiary provision should be subject to assignments of record; there was no legal reason that the trustee should join in the request for the change of the beneficiary provision, as we see it, unless it was the understanding of the Company and the insured that the change was inconsistent with the trust interest, if any, evidenced by the assignment, and was to nullify any validity the assignment might have had.

■ At the death of the insured the contract matured, and the interest of the children as the named beneficiaries became vested, unless the insured by some act done in his lifetime had removed such right. The burden of proof is upon the person who denies the right of a named beneficiary. Leahy v. U. S., 9 Cir., 15 F. 2d 949, 950; Bradley v. U. S., 10 Cir., 143 F.2d 573, 576, certiorari denied 323 U.S. 793, 65 S.Ct. 429, 89 L.Ed. 632; Zolintakis v. Orfanos, 10 Cir., 119 F.2d 571, 577, certiorari denied 314 U.S. 630, 62 S.Ct. 62, 86 L.Ed. 506; Fee v. Wells, 65 Colo. 348, 176 P. 829; Couch on Insurance, Vol. 8, Section 2189, p. 7073;

Young v. Hipple, 273 Pa. 439, 117 A. 185, 25 A.L.R. 1541.

We find that at the time the insured executed the change of beneficiary provisions as appear in the policies on file, and at all time thereafter up to his death, it was the intention of the testator that the children should have the right to the proceeds of said policies in accordance with the terms of said provisions and the insured did no act during his lifetime to remove such right.

■ In construing the policy and the various other documents involved in this case so as to give effect to the intent of the insured, we are in accord with the following general principles of law enunciated by the Court of Appeals of the Tenth Circuit, speaking through Circuit Judge Bratton in Foster v. Winingham, 169 F.2d 46, 47:

"Unless a controlling statutory provision or an effective regulation promulgated under statutory authority exacts otherwise, the intention and purpose of the insured should be given effect. * * * Narrow technicalities not contravening an applicable statutory provision or an effective regulation should be brushed aside in order to effectuate such intent and purpose. And substance rather than form should be the basis of decision."

■ We find, then, that the policies never became a part of the inter vivos trust; that if it was ever the intention of the insured, by the assignment, to make them a part of the said trust, he abandoned the intention.

We find also that the policies did not become a part of the estate of the insured, and further find that the insured had no "power of appointment" over these policies which he could exercise by will.

We find that the Bank is not entitled to any proceeds of the policies, and that the minor claimants, through their guardian, Mary K. Heyn, should receive such proceeds.